# The Mayor *against* Davis.

The Act of 12th February 1795, authorizing the extension of the market in High street, Philadelphia, is not repealed by subsequent laws, and therefore under its 4th section the city corporation had a right to pass an ordinance prohibiting the sale of beef in the western moiety of the market-house between Seventh and Eighth streets.

In construing penal statutes, the words descriptive of an offence or its punishment are not to be bent on the one side or on the other; and statutes *in pari materia* are to be construed together, and the legislative meaning of words followed.

ERROR to the Common Pleas of the county of *Philadelphia.*

This was an action of debt, instituted before the mayor of the city of Philadelphia, to recover the penalty of six dollars, for an alleged violation of an ordinance of the city, passed 28th May

VI. — X*

1835, entitled "A supplement to an ordinance relating to markets." The said ordinance is as follows : " That from and after the passing of this ordinance, the penalty imposed upon any person or persons for selling beef in the western moieties of the markethouses in High street, west of Delaware Fourth street, shall be six dollars, recoverable with costs, according to law; and that so much of any ordinance as is inconsistent with the provisions of this ordinance be, and the same is hereby repealed."

The mayor rendered judgment for the plaintiffs, and the defendant appealed to the Common Pleas, where the following case was stated for the opinion of the court in the nature of a special verdict, with liberty for either party to take a writ of error.

The defendant is a farmer, residing in Chester county Pennsylvania, where he cultivates a large farm of over 300 acres of land, nearly the whole of which is in grass, and he is the renter from the plaintiffs at an annual rent of $20, of a farmer's stall in the western moiety of the High street market between Delaware Seventh and Eighth streets in the city of Philadelphia. On the 16th day of September 1843, he sold beef from his said stall. It is agreed that the bullock in question, the meat of which the defendant then exposed for sale, was not calved on the defendant's farm, but was purchased by him in Chester county 13 months ago, in a poor and lean condition, and then totally unfit to be slaughtered for the market; that the defendant did, from the time of his purchase of the said bullock, keep, feed and fatten him on his said farm and on the produce of his said farm, until the 15th day of September 1843, when he was slaughtered by the defendant on his said farm, being then in a fat condition; that the defendant then brought the meat in question to the city and sold it from his said stall as a part of the produce of his said farm.

If the court shall be of opinion that the ordinance of the city of Philadelphia of the 28th May 1835, entitled "A supplement to an ordinance relating to markets," is legal and constitutional, and that the defendant has violated the law of the land in selling the beef, then judgment to be entered against him for six dollars, the penalty and costs; if otherwise, then judgment to be entered for the defendant.

The following are the Acts of Assembly referred to in this case:

*Act of March* 23, 1786. — An act to empower the wardens of the city of Philadelphia to extend the market-houses in High street, from Third street to Fourth street, from Delaware river, and to continue the same from time to time westwardly, from one street to another, in the middle of High street, as the wardens of the said city shall think necessary, and for other purposes therein mentioned. 2 *Smith* 272.

Whereas the inhabitants of the city of Philadelphia and the counties bordering thereon, have represented to this house the

[The Mayor v. Davis.]

necessity there is of extending the market-house in High street, westward, in the city of Philadelphia, that the old market-house was become by far too small for the accommodation of the people from the different parts of the country, who are often exposed to the inclemency of the weather, without shelter, in rain or snow, to the great danger of their health, and inconveniency of the inhabitants of the said city, and that custom and long usage have fixed High street as the most eligible and central place for the market-house to be continued.

2. That from and after the passing of this Act, it shall and may be lawful to and for the [wardens] of the city of Philadelphia, or a majority of them, and they are hereby enjoined and required to contract for materials, and employ workmen to build and extend the market-house in High street, along the middle thereof, from Third street to Fourth street, within the present or the next succeeding year, and so on from time to time, as necessity or occasion shall require, to extend the market-house in High street, from street to street, westward, as often as the [wardens] of the said city; or a majority of them, shall think proper, for the benefit and advantage of the inhabitants of the said city, and for the accommodation of the country people bringing provisions to market for sale.

3. And in order to afford a convenient opportunity for the turning of wagons and other carriages, Be it further enacted, That the first shambles or market-house, as it shall or may be extended in all or any of the said High street, shall not approach or be continued nearer than 30 feet to the line or lines of any of the streets crossing the aforesaid High street.

4. And in order that those who attend the said market with herbage and vegetables, may be accommodated with a more convenient shelter under the eaves thereof, as well as to afford a wider space for the passage of carriages, Be it further enacted, That the width or breadth of the said shambles or market-house shall not be more than 18 feet, from the outside of any one pier or column thereof to the outside of any other pier or column of and opposite to the same; and that the roof of the said shambles or market-house shall have the same elevation and projection with that already erected, and no more.

8. When the market-house shall be finished and completed, the one-half of the building so erected, shall be and remain free for the country people attending the said market for ever, and that no fees, tolls or perquisites, be demanded or exacted from them for the use thereof. And the wardens of the city of Philadelphia are authorized to let or demise the stalls which they may erect in the other half of the said building, to any person or persons, for such yearly rents and reservations as shall be agreed upon; and the rent arising from such stalls shall be paid to the treasurer of the

[The Mayor v. Davis.]

wardens of the city of Philadelphia, for the time being, for the use of the said city, and for no other purpose whatsoever.

*Act of February* 12, 1795.—A supplement to the Act, entitled, "An Act to empower the wardens of the city of Philadelphia, to extend the market-house in High street, from Third street to Fourth street, from Delaware river, and to continue the same from time to time westwardly, from one street to another, in the middle of High street, as the wardens of the said city shall think necessary, and for other purposes therein mentioned." 3 *Smith* 197.

Whereas, by an Act passed the 23d March 1786, it was enacted, That when the market-house in the city of Philadelphia, in and by the said Act directed to be built, should be finished and completed, one-half of the said buildings should be and remain free for the country people attending the said market for ever: And whereas the mayor, &c. of Philadelphia, by an ordinance made on the 8th day of June 1789, did, in pursuance of the views of the Legislature, ordain that the western moiety of the said market-house should be for the use of the inhabitants of the country, as provided for by the Act of Assembly above-mentioned: And whereas the intentions of the Legislature appear likely to be frustrated, by the intrusion of persons of a different description from those originally intended to be thus provided for:

1. *Be it enacted,* That from and after the passing of this Act, it shall not be lawful for any person whatever, to sell any beef in the western moiety of the market-house or shambles in High street, between Third street and Fourth street, in the city of Philadelphia; nor for any person exercising the trade of a butcher or victualler, to occupy any stall or sell any meat of any kind, within the said western moiety of the market-house or shambles aforesaid.

2. The mayor, &c., of Philadelphia shall have power to make and enforce such by-laws, rules and ordinances, as may be found expedient for the purpose of carrying this Act into execution, conformably to the true intent and meaning thereof.

3. The mayor, &c., of Philadelphia, in common council assembled, are hereby authorized to assess, levy and collect, from the inhabitants of the said city, and upon all estates real and personal and taxables, within the same, such sum or sums of money as they may deem necessary, to enable them to extend the market in High street, whenever they may think proper so to do; which taxes shall be levied and collected in the same manner as the city taxes are.

4. When the market shall be so extended, one-half of the buildings erected shall be and remain free for the country people bringing the produce of their farms to market, for ever, and agreeable to what is directed by the first section of this Act; and that no fees, tolls or perquisites be demanded or exacted from them, for the use thereof.

*Act of March* 19, 1804.— An Act to authorize the select and common councils of the city of Philadelphia, to erect market-houses in the said city.  4 *Smith* 165.

1. From and after the 1st day of November next, it shall and may be lawful for the select and common councils of the city of Philadelphia, to cause a market-house or market-houses to be erected, at such place or places within the said city, as to them may appear most conducive to the interest and convenience of the citizens thereof, and others who may have occasion to use the same; and to make such regulations for the government of the said market, as to them shall appear useful and necessary, and not inconsistent with the existing laws of this Commonwealth; *Provided*, that one-half of the buildings so erected, shall be and remain free for the use of the country people attending the said market, and that no fees, tolls or perquisites shall be demanded or exacted from them, for the use thereof.

*Act of March* 19, 1810. — An additional supplement to the Act, entitled, "An Act to empower the wardens of the city of Philadelphia, to extend the market-house in High street."  5 *Smith* 118.

1. It shall and may be lawful for the corporation of the city of Philadelphia, when, and as often as they shall think proper, to extend the market-house in High street or elsewhere, in the said city, to build a market-house or houses, to let or demise the one-half of the stalls which they may erect to such persons from the country, as send or carry the produce of their farms to the said market, and to no others, and to let the other half of the stalls so erected, at their own discretion, to such person or persons, butchers or victuallers, as to them it may seem proper; any law, usage or custom to the contrary notwithstanding.

2. Whenever the market-houses in High street shall be extended, it shall not be lawful for any *victualler* to sell any beef in the western moiety of any market-house or shambles that may be erected at any time hereafter in High street; but the western moiety shall be let to such persons from the country who send or carry the produce of their farms to market, and to no others; and the one-half of the stalls that may be erected elsewhere, shall also be let to such persons from the country, who send or carry the produce of their farms to market, and to no others: *Provided*, that the annual rent so to be charged and received, shall not exceed $20 per stall.

The court, after argument, rendered judgment for the defendant, which was now assigned for error.

*Olmsted*, for the plaintiff in error.  The only question is, whether an ordinance of the city preventing the sale of beef in the western moiety of this market, is within the authority given by the legislative Acts on the subject.  The charter of William Penn

[The Mayor v. Davis.]

authorized a market, and clerks to be appointed.  After the revolution a charter was given to the city by Act of Assembly, but it contained nothing on the subject of building markets.  Shortly after, the Act of 1786 was passed, authorizing the extension of the market-house from Third to Fourth street, and so on from time to time as necessity or occasion required.  By the 8th section of this Act, the one-half of the market-house was to be free to the country people, and the other half to be let for the use of the city.  In 1795, however, another Act was passed, which prohibits the sale of beef in the western moiety of this market from Third to Fourth street, by the express words of the 1st section, by any person whatever, butcher or other person.  The 3d section gives the right to extend the market further, and by the 4th section the provisions of the 1st section are extended to all such future markets to be built.  The market now in question being beyond Fourth street, is one extended since, and therefore falls within the same regulations as the market from Third to Fourth street.  The words of the 4th section are, that one-half shall be and remain free for the country people bringing the produce of their farms to market, agreeably to what is directed by the 1st section.  On this Act there could not be a doubt; but the doubt is raised by the Act of 19th March 1810; for that of 1804 is only to authorize markets in other places than High street.  Now the Act of 19th March 1810 does not repeal that of 1795 expressly, nor by any necessary implication, but is perfectly consistent with it.  Its great object was to give the farmer an exclusive right to a stall, by taking a lease of it and paying a rent, so as to exclude intruders, hucksters and others, who had begun to deprive him of the stalls by prior occupation.  Some slept on the stall for that purpose, and held it by continual possession.  The Act directs, therefore, that the stalls shall be let only to those who send or carry their produce from the country.  It limits the rent to $20, and confines the sale of beef by the victualler to the eastern moiety of the market.  All this goes to show, that instead of repealing the provisions of the Act of 1795, the Legislature meant to continue them, as they had been found advantageous both to the butchers and the country people, and the city derived a much larger rent from the butcher to enable it to pay the expense of building and keeping up the market, of maintaining clerks of the market, of cleaning and lighting the market-houses, and other expenses.  It is clear, that produce of the farm did not include beef, under the Act of 1795; why, then, should it under the Act of 1810?  The rule is well settled, that different statutes *in pari materia* are to be construed together, and the same word to receive the same construction in all.  This is the rule in construing bankrupt laws, poor laws, and all others. *Rex* v. *Loxdale*, (1 *Burr.* 447).  And the use of the words, "produce of the farm," in the Act of 1795, is borne out by correct grammatical construction; for beef is an article manufactured

from the produce of the farm by those who exercise what the Act of 1795 calls, " the trade of a butcher or victualler." The present question is not between the butchers and the farmers, as is commonly supposed; it is a question merely affecting the city's right to a revenue from the markets.

*Lewis* and *Norris,* contra. This is a mere question between the butchers and the farmers. The former desire a monopoly—to compel the farmer to sell to them, and then charge the citizen. The butcher's trade requires no skill, and even in England would not come within the apprentice laws. The streets being public highways, the city has no power to erect or regulate markets, except what is given by the Legislature; *Commonwealth* v. *Passmore,* (1 *Serg. & Rawle* 221); *Rung* v. *Shoneberger,* (2 *Watts* 25); *Philad. and Trenton Railroad Co.,* (6 *Whart.* 44); and the authority to prevent farmers from selling beef in the western moiety of this market, is not given by the Acts of Assembly. The Act of 1795 was not intended to alter the free and full right given by the Act of 1786. The preamble recites that the franchise of 'the country people had been intruded upon, and its object was to secure, but not to restrict them. There was little or no beef raised in the adjoining counties in 1795; and that was not in view. Since the year 1802 these counties have become grazing counties, and the feeding and fattening of cattle are an important item of agriculture; and the object of the Act of 1810 was to secure the farmers against the shinners who intruded upon them. The intention of the Legislature is to be ascertained from the necessity under which the Act was made. 15 *Johns.* 380; 1 *Wheat.* 115. A penal statute is to be construed strictly, and not extended by construction, and there is no prohibition in the Act of 1810 as to any market beyond Fourth street. The Act of 6th April 1802, (3 *Sm. L.* 530), is also an important Act, and to be considered in determining this question. It enacts, that from and after the passing of this Act, it shall and may be lawful for any person or persons to sell or expose to sale provisions, vegetables or fruit in the markets of any city, borough, or corporate town within this Commonwealth, provided such provisions, vegetables or fruit shall not have been previously purchased within the limits of such city, borough or corporate town; any law to the contrary notwithstanding. And in the word " provisions," beef is certainly included, being the most important. Again: the Act of 1804 expressly makes markets to be thereafter built, free for the use of the country people attending them: and to the same effect is the Act of 1810, under which the market now in question was built. The western moiety is to be let to such persons from the country who send or carry the produce of their farms to market, and to no others; whilst the butchers are prohibited from selling beef there. It is a common law right to sell and buy where you can find a market, and grants

276 SUPREME COURT [*Philadelphia*

[The Mayor v. Davis.]

to corporations are construed strictly. 2 *Cow.* 420 ; 4 *Cow.* 144 ; .
*Cowp.* 29 ; 15 *E. C. L.* 37. Produce is that which the legitimate
proceeds of farming yield. This includes the purchasing and
grazing of cattle.

*Dallas,* in reply, insisted that the interest of the great body of
the farmers was promoted by this ordinance, however a few
colourable farmers might think otherwise. The main question,
however, is, whether the Act of 1795, the enactments of which are
precise and clear on the subject, is repealed by any subsequent
legislation. It is incumbent on the party alleging this to show
that it is so by express words or necessary implication. The
object of the Act of 6th April 1802, is only to secure to the coun-
try people the common law freedom of markets in any town or
place in Pennsylvania : but it does not extend to the market-house,
which was built by the city of Philadelphia as its own, and at its
own expense, and over which the control is given to them. The
markets are far beyond the market-houses : the one belongs to the
State and its citizens, the other to the corporation. If the Act of
1802 is applied in all its extent, it sets aside the whole system of
the city market-houses. No clerks could inspect, no corrupt or
unwholesome provisions could be expelled. As to the Act of 1810,
it is evidently for the protection of the country people, by keeping
out intruders, and extends their privileges, by enabling them not
only to come, but to send a person to market. Independently of
the Act of 1795, will it be pretended that they could bring every
kind of produce to the market-house ? Could they bring there
and place on the stalls manure, or hay, or wood, or charcoal, under
the name of produce ? And is there no power to regulate the
general right, by fixing the time, place and manner of conducting
the market ? Beef is not the produce of a farm, any more than
hats, or shoes, or shirts made from the raw article ? A farm is
defined to be cultivated ground, and the produce is that which
grows from it. Beef is defined to be the flesh of black cattle pre-
pared for food. He who prepares and brings in such beef to mar-
ket becomes a butcher, and subject to all that attaches to that
character. A bullock not raised on the farm, but bought, is not
the produce of the farm. He may have grazed from time to time
in several, and which one can lay claim to him as its produce ?

The opinion of the Court was delivered by

GIBSON, C. J. — So far as statutes for the regulation of trade
impose fines or create forfeitures, they are doubtless to be con-
strued strictly as penal, and not liberally as remedial laws. Of
this stamp are revenue laws, and laws for the registry of ships, as
was held in *Hubbard* v. *Johnston,* (3 *Taunt.* 377), and of the same
stamp is at least one of the laws for the regulation of this market,
so far as the corporation is empowered by it to enforce obedience

to it by the infliction of a penalty. But it cannot be maintained that a penal statute is to be construed strictly in all its parts; or that the words of it are to be narrowed in their operation, even in those parts of it which define the offence and annex the penalty. "We are to look at the words, in the first instance," said Justice BULLER, in *Rex* v. *Hodnett*, (1 *T. R.* 96), "and, where they are plain, we are to decide on'them. If they are doubtful, we are to have recourse to the subject-matter." - The true rule is, that words descriptive of an offence, or the punishment of it, are not to be bent to the one side or the other. The question, then, is, whether the Act of the 12th February 1795, which explicitly prohibits the sale of beef in the western moiety of every High street market-house above Third street, has been expressly or impliedly repealed, in whole or in part, by the Act of the 19th March 1810.

The Act of the 23d March 1786, which is the first member of the series, did no more than authorize the corporation to extend the market in High street, from Third to Fourth street, and still further when it should be thought necessary: but on condition that the western moiety of each market-house should be left free to the country people. The stalls in the other moiety were to be rented. This does not touch the case before us. Then came the Act of 1795, reciting that the intentions of the Legislature were likely to be frustrated by the intrusion of persons of a different description from those intended to be provided for by the preceding Act, and declaring that " it shall not be lawful for *any* person whatever to sell any *beef* in the western moiety of the market-house or shambles in High street between Third and Fourth streets; nor for any person exercising the trade of a butcher or victualler to occupy any stall or sell any meat of any kind, within the said western moiety of the market-house or shambles aforesaid." This settled the question as to the market-house then about to be built. But the Act gave the corporation the same power that was given to it before, to extend the market indefinitely to the west, expressly subject, however, to the preceding prohibition. Hence, it became unlawful to sell beef in the western moiety of any market-house on High street subsequently erected. By what statute has this prohibition been repealed?

The Act of the 6th April 1802, which is alleged to bear on it because it declares generally that any person may sell provisions in any city, borough, or corporate town, was not intended to be applied to the High street market, which had a code of its own; nor was it intended to destroy, at one fell swoop, all restrictive regulation elsewhere. Any one may doubtless sell provisions in a market-town, but only at the market-place appointed for the sale of the particular article. There certainly was no design to sanction the intrusion of their poultry and pigs into the churches or the dwellings of the inhabitants, or into any other place that would be improper for the exhibition of them. It is impossible to

[The Mayor v. Davis.]

conjecture, at this day, what was the grievance intended to be redressed by it, or why a law declarative of a right so unquestionable before it, should have been thought necessary.   It was probably to maintain the quarrel of a few market-people with the authorities of some incorporated village or town; but it was certainly unnecessary to back it with the august power of the Legislature.   Nor does the Act of the 19th March 1804, which authorizes the corporation of Philadelphia to establish markets, with analogous regulations in other parts of the city, touch the question more nearly.   We come then to the Act of the 19th March 1810, which consists of two sections containing very nearly the same provisions for the very same thing; and which consequently exhibits a lack of precision and perspicuity.

The first provides that it shall be lawful for the corporation to extend the market in High street or elsewhere, and to build market-houses; "to let or demise the one-half of the stalls they may erect, to such persons from the country as send or carry the produce of their farms to the said market, and to no others; and to let the other half of the stalls so erected, at their own discretion, to such persons, victuallers or butchers, as to them may seem proper; any law, usage or custom to the contrary notwithstanding."   The concluding expletive was not thrown in to give the section a repealing tendency.   It was freely used by the Legislature, at that day, to round off a period, and perhaps to jog the memory of the Judges, lest they should forget that posterior laws abrogate those which happen to be prior and contrary to them. The other section provided, that "whenever the market-house in High street shall be extended, it shall not be lawful for any *victualler* to sell beef in the western moiety of any market-house or shambles that may be erected at any time hereafter in High street; but the western moiety shall be let to such persons from the country who (as) send or carry their produce to market, and no others; and the one-half of the stalls that may be erected elsewhere, shall also be let to such persons from the country who (as) send or carry the produce of their farms to market, and no others:" provided, that the annual rent do not exceed twenty dollars the stall. From this, it is said, we must infer, that because victuallers, and they only, are expressly forbidden to sell beef in the western market, and because the stalls are required to be let to those who fetch the produce of their farms to market, the occupants were to be at liberty to use them for the sale of every thing, without exception, which happens to be the immediate or remote produce of his farm.   But why was this statute enacted, and what was the mischief to be corrected by it?   Certainly not to authorize the extension of the market, for that had been doubly done before. The object was simply to let the stalls.   And here let me say, it is the bungling attempts of the penman to say the same thing in different words, which so frequently involves the meaning of the

[The Mayor v. Davis.]

legislature in uncertainty. It is a matter of history, that the mischief which called for correction, was the confusion and jostling which occurred before their several places were assigned to the country people ; and the legislature intended no more than to apply a remedy to it, by giving each a separate right to a stall. Surely the petty rent of twenty dollars was not meant to be compensation for a privilege which would put a grazier on a par with a regular victualler, who is compelled to pay much more for his stall. Why then should it be thought that because a moiety of the stalls is required to be let to the country people, they must necessarily be at liberty to use them for the sale of every thing which a farmer brings from the country ? The inference attempted, is that because the stall is let to one who markets the produce of a farm, he may use it to market whatever is the produce of a farm in the largest sense. But we are called on not to put a construction on the Act of 1795, which is in some measure a penal one—for it needs no construction—but on the Act of 1810, which is asserted by the defendant himself to be remedial; and if we are to be guided by common sense applied to the context, we must suppose that there are many things which are necessarily exceptions to the general expression. Swine, horses, neat cattle, sheep, manure, cord-wood, hay, and many other things not more savoury, *would be out* of place in a market-house for the sale of poultry, vegetables, fruit, eggs, milk, butter, lard, and other provisions for the mouth ; yet they are strictly produce of the farm : much more so, indeed, than beef, which, though it comes, like every thing else, primitively from the soil, is as much a manufactured article as leather, cloth, or charcoal. The ox is the produce of the farm ; beef is the produce of the slaughter-house and the shambles. It is manufactured by the professional skill of an artisan, whose business is as distinct from that of a farmer, as is that of a flax-dresser or a wool-comber. That the farmer sometimes works up his own raw materials, cannot prevent it from taking a new denomination from the additional labour expended on it. The versatility so conspicuous in the American people, often makes him his own weaver; yet it follows not that his linsey-woolsey, though cut from his own sheep, is the less manufactured, or the less improperly denominated the produce of his farm. The blending of trades does not change the nature of the wares. When the farmer slaughters his own ox, the beef is not less the product of the slaughter-house ; and this may be the reason why it was thought unnecessary to re-enact the prohibition of the preceding Act, against the sale of beef in the western parts of the market-houses, by any person, whether farmer or victualler. The three statutes which I have drawn particularly into view, being parts of a system, are to be taken together as one; for it is to be intended that the system was meant to be consistent throughout. The interpretation of statutes in *pari materia* by each other, has

[The Mayor v. Davis.]

been carried so far, that it was said by Lord Mansfield, in *Rex* v. *Loxdale,* (1 *Burr.* 447), " that all which relate to the same subject, notwithstanding some of them may be expired or not noticed, must be taken to be one system, and construed consistently." But what is more to the purpose, it was ruled in *The King qui tam* v. *Smith,* ( 4 *T. R.* 419), that when the same word is used in statutes which are in *pari materia,* a distinction as to the sense in which it is used in the one, is a legislative exposition of the sense in which it is to be understood in the other. And in *Bacon's Abr. Title,* " *Statute*" *I.* it is said that words and phrases whose sense, in a statute, has been ascertained, are to be understood in the same sense when used in a subsequent statute. Now the phrase ' produce of a farm,' was taken, in the Act of 1795, not to include beef; and it is consequently not to include beef in the Act of 1810. As the Act of 1795 expressly gives the corporation power to enforce the prohibition by such by-laws as might be found necessary, the penalty was legally imposed, and must be recovered.

Judgment of the Common Pleas reversed, and judgment of the Mayor affirmed.