Wartman *et al. versus* The City of Philadelphia *et al.*
Pratt *et al. versus* The Same.

An Act of Assembly is *passed*, only when it has gone through all the forms made necessary by the constitution to give it force and validity as a binding rule of conduct for the citizen.

Whether it receive the signature of the governor, or remain in his hands unreturned for ten days, or being vetoed is carried by two-thirds of both houses, its passage is dated from the time it ceased to be a mere proposition or bill, and passed into a law.

An Act of Assembly cannot impair a contract made after it has passed both houses of the legislature, but before its approval by the governor.

By the common law of Pennsylvania, every municipal corporation, that has power to make by-laws and establish ordinances to promote the general welfare, and preserve the peace of a town or city, may fix the times or places of holding public markets for the sale of food, and make such other regulations concerning them, as may conduce to the public interest.

The right to establish markets is expressly given to the city of Philadelphia by statute.

The right to establish a market, includes the right to shift it from place to place, when the convenience or necessities of the people demand it.

The general right to build market-houses, and to shift them from place to place, as occasion may require, does not imply a right to build them on the public highway.  The market-houses built in the middle of High street, in the city of Philadelphia, were a nuisance, until legalized by the Act of 1804.

The erection and maintenance of a nuisance in a public highway, dedicated to the use of the whole people, is as liable to punishment when done by a public corporation, as by private individuals.

When the legislature legalized the market-houses on High street, and authorized their extension, they granted privileges, but did not impose an obligation to maintain them.

If the privilege of using the street as a market-place, was coupled with the condition that the stalls should be free, that condition was annulled by the abandonment of the privilege.

The Act of 1804, making the stalls free to the country people for ever, was repealed by the Act of 1810, which authorized the corporation to let one half of the stalls to farmers, and the other half to butchers and victuallers, at an annual rent, not exceeding $20.

In Equity.  Motion for special injunction.*

These were two bills in equity.  The first was filed by Edward Wartman and John F. Gross against The Mayor, Aldermen and Citizens of Philadelphia, George W. Brown, John McCrea, Anna Hertzog, John Rice, and The First Reformed Dutch Church.

It set forth that the complainants were residents, tax-payers,

* This case was decided on the 3d April 1854.

[Wartman *et al. v.* The City of Philadelphia *et al.*]

and inhabitants of the county of Philadelphia; and that Edward Wartman was, and had been for twenty-five years last past, the lessee of a stall in the High street market, between Third and Second streets.

That by the 1st section of an Act of Assembly, passed finally on the 31st January 1854, and approved by the governor on the 2d February 1854, the corporate name of the Mayor, Aldermen and Citizens of Philadelphia, was changed to The City of Philadelphia; the boundaries of the said city were extended so as to embrace the whole county, and the powers of the said corporation were to be exercised over the inhabitants thereof. That by the 36th section it was provided, that after the said law should go into full effect, the debts of all the municipal corporations within the said county should be consolidated into one; and that there should annually be raised, by taxation, a sufficient amount to discharge the annual interest thereon.

That it was provided by the 6th section of the said act, that no corporation thereby superseded, or whose estates might by force thereof be vested in the city of Philadelphia, " or the present councils of the corporation of the Mayor, Aldermen and Citizens of Philadelphia," should, at any time after the passage of the said act, contract any loan or debts, other than for the ordinary supplies, repairs, and payment of labour and salaries.

That on the 30th January 1854, after the said act containing the above sections and provisions had passed the Senate, and had also passed the House of Representatives, with certain amendments, which required and obtained the concurrence of the Senate on the next morning, the councils of the said corporation, at a special meeting held, as the complainants charged, for the express purpose of circumventing the legislature, passed an ordinance providing for a debt and loan of more than $1,000,000, for the purchase of certain real estate, to be used for market-houses in the said city, and for erecting market-houses thereon; and authorized a committee of councils to take measures to carry the same into effect.

That, at a subsequent meeting of the said councils, on the 2d February 1854, after the said act had been signed and approved by the governor, and was in full effect, the said committee reported that they had purchased certain real estate from the other defendants in the bill, as sites for market-houses; whereupon a resolution was passed by the said councils, authorizing the city treasurer to issue certificates of city loan in payment therefor. And the said committee, at the same time, submitted a contract which they had made with the said John Rice, for the erection of four market-houses on the said lots, whereby the cost of erecting the same was to be paid by the said corporation, and the said John Rice was to receive a commission of five per cent. thereon; to be paid for in certificates of city loan.

[Wartman *et al. v.* The City of Philadelphia *et al.*]

That the said purchases and the erection of the said market-houses would create a debt exceeding $1,000,000; and that the said contract was finally completed after the passage of the said act, and after the prohibition therein contained was in full force. That the said vendors knew of the progress of the said act through the legislature; and that the said ordinance and contracts were hurried through, in contemplation of the passage thereof, and in order to defeat the prohibition therein contained.

That, even if the ordinance of the 30th January 1854 did contract a loan or debt, for the purposes aforesaid, it was utterly null and void, for the reasons thereinafter set forth; and that all contracts made under colour thereof, with the knowledge of the facts therein charged, were contrary to equity, and could not be enforced to the injury of the citizens and tax-payers, especially of those whom the said wrongful acts would, if successful, burden with the debt thereby attempted to be imposed upon them.

That the market-houses on High street, and elsewhere in the said city, were abundantly sufficient for the accommodation of the persons vending provisions therein, and of the inhabitants of the said city; that they produced a revenue of twelve per cent. upon their cost. That it was the intention of the city councils to demolish and remove the same, if their tenure of office should subsist until the erection of the contemplated new market-houses; and that if the new city councils, provided by the said act, should resolve not to demolish the same, the said debt of over $1,000,000 would have been contracted for purposes useless and worthless to the inhabitants of the enlarged city. But if the councils of the enlarged city should resolve to use the new buildings thus forced upon them, the same would not yield a revenue of three per cent. upon their cost.

That by the Act 23d March 1786, the wardens of the said city were required to extend the market-houses along the middle of High street, westward from Third street, as occasion should require; and that, when the same should be completed, the one-half of the building so erected should be and remain free for the country people attending the said market for ever. That by an ordinance passed the 8th June 1789, the western half of the market-house, then finished, was appropriated for the use of the inhabitants of the country. That by the Act 12th February 1795, the city was authorized to levy taxes to enable them to extend the market-houses in High street; and by the same act it was provided, that one-half of the buildings to be erected should be and remain free for the country people, bringing the produce of their farms to market, for ever.

That by Act 19th March 1804, the said city was authorized to erect market-houses at such places as should be most conducive to the interest and convenience of the citizens, and others who might

have occasion to use the same, and to make regulations for the good government thereof; provided, that one-half of the buildings should remain free for the use of the country people attending the said markets. And that by Act 19th March 1810, the said city was authorized to extend the market-house in High street, or elsewhere in the said city; to build a market-house or houses; to let or demise one-half of the stalls which they might erect, to such persons from the country as sent or carried the produce of their farms to the said market, and to no others; and the other half to such butchers and victuallers as they might deem proper.

That the complainants were advised, and believed, that the destruction of the public market-houses in High street was not authorized by law, and that the said city corporation had not the right to demolish the same. They therefore prayed that the said contracts, and all certificates of loan issued in pursuance thereof, might be declared void, and that the same might be cancelled; and that the defendants might be perpetually enjoined from delivering or receiving any conveyance, or certificates of stock, or money, under the pretended authority of the said ordinance or contracts, or from proceeding further to execute the same; and for further relief, &c.

The second bill was filed by Thomas Pratt and others, farmers and lessees of stalls in the said High street market, for the sale of the produce of their farms, against the same defendants, setting forth substantially the same facts, and averring that the said city corporation had no other right or property in the said market-houses, than to hold the same as a franchise granted by the charter and Acts of Assembly; and in trust to exercise a proper care and regulation over them, for the use, benefit, and advantage of the inhabitants of the city, and of the complainants and others, sending and carrying the produce of their farms to the said market for sale. And that the complainants had a vested right to the use and occupancy of said market-houses, for the sale of the produce of their farms. They, therefore, prayed that the defendants might be restrained from demolishing the said market-houses, and from proceeding further with the execution of the said contracts for the purchase of lots and erecting new market-houses thereon, &c.

The defendants by their answers admitted substantially the facts charged in the bills; but the city authorities claimed, that it was the intent of the legislature, by the acts referred to in the bills, not to confer on them the power to establish markets, which they already possessed, but to give them the right to erect market-houses in the public highways. That it was the intention of the legislature, to authorize the erection of such market-houses; not to oblige the defendants to maintain them for an indefinite period.

[Wartman *et al. v.* The City of Philadelphia *et al.*]

That they were authorized by said acts to charge persons from the country $20 per annum for the use of the stalls. That they were not thereby prevented from removing the said market-houses whenever the public interests would be served thereby. That the increased demand upon High street for the convenient transportation of merchandise, had rendered it expedient that the market-houses should be removed therefrom, and others provided for the convenience of the citizens. And with that view they had purchased the lots and entered into the contracts set forth in the bill.

These answers having been filed, the complainants moved for a special injunction according to the prayer of the bills.

*W. L. Hirst* and *Speakman*, for the complainants.

*Olmsted*, for the defendants.

The opinion of the court was delivered by

BLACK, C. J.—The plaintiffs in the first of these cases, are citizens and tax-payers in the Northern Liberties and Spring Garden. The plaintiffs in the other case are farmers, resident in the counties of Delaware, Chester, and Montgomery, and lessees of certain stalls in the High street market of the city. The matter complained of in both bills is, that the city councils have resolved to contract for the erection of new market-houses, with the intention of demolishing those already existing in High street, an act which, if consummated, the plaintiffs aver, will greatly prejudice the legal rights of the farmers, increase the taxation of the newly consolidated city, and be otherwise detrimental to the public interest.

The admitted facts are, that on the 8th of December 1853, the councils authorized the committee on city property to negotiate for sites for new market-houses, in four different quarters of the city, with the view of ultimately removing those in High street. The committee, in pursuance of this resolution, negotiated for certain lots, and reported to the councils, recommending the purchase of them at $650,000. On the 30th of January 1854, the councils ordered them to be purchased, and it was immediately done. On the 2d of February, an ordinance was passed authorizing the issue of certificates of loan, for the payment of the price of the property purchased. The Act of Assembly, consolidating the city and the districts, previously composing the county of Philadelphia, into one city, was signed by the governor and became a law on the 2d day of February last.

This motion for a special injunction ought to be successful, if there be any fair reason for the opinion, that the facts disclose an intention to do that which the city authorities had no legal

[Wartman *et al. v.* The City of Philadelphia *et al.*]

power to do. All that appears in the bills and answers, and every-thing that has been said in the argument, on the one side as well as on the other, have tended to impress us with a feeling unfavour-able to the justice and propriety of these proceedings. The addi-tion of six hundred and fifty thousand dollars to the public debt, involving the necessity of another large expenditure for building, would possibly not have been made, if the present councils had anticipated that their own constituents would be compelled to pay it. But it was done when the consolidation law was on its passage, and when it must have been known, or at least confidently believed, that the greater part of the burden, thus suddenly created for the benefit of the old city, would have to be borne by a differ-ent people, outside of its limits, who were not represented in the councils, and to whom the members were not responsible.

But the case, as it comes before us, is a question of law, and not of morality—of power, and not of propriety. If they kept their action within the bounds of the authority given them in their charter and the general law of the land, and if that authority was not taken away or diminished by any law existing at the time, the motion must be refused. If this was a matter which they had a right to decide, they are not bound to vindicate the propriety of their decision to us; and this, perhaps, we ought to presume, is the reason why they have not attempted to do so. If it be a legal exercise of their power, we must pronounce it legal, without paus-ing to be satisfied also of its justice. We have no jurisdiction which enables us to control the abuses of such authority. We can only check the usurpation of that which does not exist.

In the view which we take of the subject, it is not necessary to consider the purchase of sites for new market-houses and the demolition of the old ones, as two separate questions. It is true, that one of these acts may be done and the other not, and argu-ments are made for and against one which do not apply to the other. But by the construction which common sense puts on the resolutions and ordinances of the councils, it seems very plain, that they have purchased the property mentioned in the bill, with a view to the ultimate removal of the structures now standing on High street. This then is to be considered, not as the creation of a debt for building new and unnecessary market-houses, without any abandon-ment of the old ones; nor is it the demolition of the old ones, with-out substituting others in their place. It is the removal of the markets from one place to another. It is changing their location from the centre of High street, to the lots purchased in four different sections of the city. It is tearing down the open sheds and building close-walled houses. It is giving up eight squares of stalls, and supplying the public with what is equal in capacity to fourteen squares.

The inquiry into the legal power of the councils to change the

[Wartman *et al. v.* The City of Philadelphia *et al.*]

places of selling and buying provisions, divides itself naturally and simply into two branches. 1st. Whether the authority ever existed? and 2d. If it existed previously, did the consolidation act take it away? We will consider the latter proposition first.

The act referred to as the consolidation act, provides, that when the government of the new corporation is organized, the debts of the present city and of all the districts shall be consolidated into one, and forbids that any of the present corporations "shall at any time, *after the passage of this act,* contract any loan or debt, other than for the ordinary supplies, repairs, and payment of labour and salaries." Now it is wholly impossible for us to say that this prohibition to contract extraordinary debts *after* the passage of the law, applies to debts created *before* its passage. There is nothing retrospective in it. If the debt in question was legally contracted, the legislature could not annul it by an act of theirs subsequently passed; much less could we annul it by the mere construction of a statute, which in terms does not touch it. We have only to inquire, then, whether the debt was contracted before or after the passage of the consolidation act. An act of the legislature is passed, only when it has gone through all the forms made necessary by the constitution to give it force and validity, as a binding rule of conduct for the citizen. Whether it receives the signature of the governor, or remains in his hands unreturned for ten days, or being vetoed, is carried by two-thirds of both houses, its passage is dated from the time it ceased to be a mere proposition or bill, and passed into a law. It cannot impair a contract made while it was pending before the executive, any more than it could destroy a legal obligation existing a year before it was moved in by the legislature. It would be *ex post facto*, if it provided for the punishment of a crime committed the day before its approval, as clearly as if it assumed to reach back to the beginning of time. The act in question was approved on the 2d of February 1854. On the evening of that day, and we will presume after the bill was signed, the city councils authorized certificates of loan to be issued to the several vendors of the real estate purchased as sites for the new market-houses. If the debt had not been contracted before that time, it would probably have been too late to be binding on the new city. But the negotiation had been authorized as early as the 8th of December, and the committee on city property had reported a provisional contract with the other defendants on the 30th of January. This report was approved and the purchase ratified by councils the same day. The written contracts, executed on behalf of the city by the mayor, and sealed with the corporate seal of the city, are dated on the 1st day of February. The debt was made at that time, and not when the certificates of loan were issued. It cannot be said, that the contract is illegal, because a law passed the day afterwards,

[Wartman *et al. v.* The City of Philadelphia *et al.*]

prohibited such contracts in the future.   When an argument simi-
lar to that now made by the plaintiffs' counsel was urged upon
this court in the case of Dana *v.* The United States Bank, 5 *W.
& S.* 223, the opinion of Mr. Justice KENNEDY declared it to be
without the shadow of a foundation.

A more important, if not a more difficult point, is, whether the
councils had the power, before the consolidation act was passed,
to remove the market-houses from High street to other places
within the city.   It is argued, that the city corporation is a mere
trustee for the farmers and victuallers, or country people, bound
to maintain the markets for their use, at the places where they
now are, and without authority to remove them except with their
consent.

The necessity of a public market, where the producers and
consumers of fresh provisions can be brought together at stated
times for the purchase and sale of those commodities, is very
apparent.   There is nothing which more imperatively requires the
constant supervision of some authority which can regulate and
control it.   Such authority in this country is seldom, if ever, vested
in individuals.   It can never be so well placed, as when it is put
into the hands of the corporate officers who represent the people
immediately interested.   A municipal corporation, comprising a
town of any considerable magnitude, without a public market
subject to the regulation of its own local authorities, would be an
anomaly which at present has no existence among us.   The state
might undoubtedly withhold from a town or a city the right to
regulate its markets, but to do so would be an act of mere tyranny,
and a gross violation of the principle universally conceded to be
just, that every community, whether large or small, should be
permitted to control, in their own way, all those things which con-
cern nobody but themselves.   The daily supply of food to the
people of a city is emphatically their own affair.   It is true, that
the persons who bring provisions to the market have also a sort
of interest in it, but not such an interest as entitles them to a
voice in its regulation.   The laws of a market (I am now using
the word *in its larger sense*) are always made by the persons who
reside at the place, and that whether they be buyers or sellers.
It is, therefore, the common law of Pennsylvania, that every muni-
cipal corporation which has power to make by-laws and establish
ordinances to promote the general welfare, and preserve the peace
of a town or city, may fix the time or places of holding public
markets for the sale of food, and make such other regulations
concerning them as may conduce to the public interest.   We take
this to be the true rule, because it is necessary and proper, in
harmony with the sentiments of the people, universally practised
by the towns, and universally submitted to by the residents in the
country.

[*Wartman et al. v.* The City of Philadelphia *et al.*]

The municipal corporation known to the law by the name of "The Mayor, Aldermen and Citizens of Philadelphia," had this power, not only by virtue of the general terms of its charter, and from the necessity of the thing, to prevent a principal object of their organization from being defeated, but it was conferred in express terms. In the charter given to the city by William Penn in 1701, markets were authorized two days in the week, without designating the place. This charter was supposed to be annulled by the Declaration of Independence, and during the revolutionary period, the city was governed by wardens. In 1789, a new charter was given, and the privileges relating to markets were granted again. If there were any ambiguity in these acts, those of 1804 and 1810 would put all doubts at rest. They provide that the councils shall have power to erect market-houses where they please, and regulate them as they think proper, so that no existing law of the Commonwealth be violated.

The right to establish a market includes the right to shift it from place to place, when the convenience or necessities of the people demand it. This was decided in 1817, by the Court of King's Bench, in Rex *v.* Cottrell, 1 *Barn. & Ald.* 67, a case very much like the present. If the English law, saturated as it is with conservatism, and particularly hostile as it was at the time to everything which might change the old customs of the boroughs, had regard enough for the public necessities and convenience, to adopt this rule, it will hardly be rejected here, where changes are so rapid, improvement so necessary, and the prejudice against reforms so slight. It would be fastening a strange imbecility upon the government of an American city, to decide that it shall not have new market-houses, whatever may be the need of the people, without also maintaining old ones after they become useless.

But the general right to build market-houses and to shift them from place to place, as occasion may require, does not imply a right to build them on the public highway. High street is a public highway, made so by the words of the Penn charter. The market-houses built in the middle of it were a nuisance previous to the Act of 1804. Those who maintained them might have been indicted, and any citizen could have abated them. It required the supreme legislative authority of the state to take away from them their criminal character. The members of the common council were mistaken when they voted, in 1773, that they were satisfied of their right to obstruct the middle of the street, if they left a proper space on each side of the passage for carriages. They could no more obstruct it partially, than close it altogether, and a nuisance erected and maintained by a public corporation in a highway dedicated to the use of the whole people, is as liable to legal punishment, as the same acts done by private parties. It was so decided by the Supreme Court of Alabama, in The State *v.* The

City of Mobile, 5 *Porter* 279, a case precisely like this; and our own cases of The Commonwealth *v.* Rush, 2 *Harris* 186, and Commonwealth *v.* Bowman, 3 *Barr* 206, abundantly show that the same principle is part of the law in this state.

When the legislature, in 1804 and 1810, legalized the market-houses on High street, and authorized their extension, it created a privilege, not an obligation. Those laws were merely permissive. If the members of the corporation became convinced, in the course of time, that the unobstructed use of the street as a highway, was of greater public value than its occupation as a market, they were free to leave it to the purpose for which it was originally intended, and fall back on their previously existing right to build market-houses elsewhere. If the privilege of using the street as a market-place, was coupled with the condition that the stalls should be free, that condition would be annulled by the abandonment of the privilege. Besides, we think it very clear that the Act of 1804, making the stalls free to the country people for ever, was repealed by the Act of 1810, which authorized the corporation to let one half the stalls to farmers, and the other half to butchers and victuallers, at an annual rent, not exceeding twenty dollars. It is true, that the words of the act are not absolutely free from ambiguity. It is possible, that the authority to rent stalls was intended to relate to those subsequently erected. But there has not been a free stall in any part of the High street market since 1810. After a uniform construction has been given to the law, for nearly half a century, by all the parties interested, and, among others, by the present plaintiffs themselves, it is too late to expect that we will give another. Mr. Pratt, and the other farmers who complain with him, being mere lessees from year to year, without the right of renewal, are not so interested as to make it necessary for their sakes to stop the progress of a contemplated improvement which concerns so many other persons. If they should be illegally disturbed before the expiration of their present lease, an action at law will give them a full remedy.

It is said, that the old city corporation holds the property it possesses in trust for the new one, and therefore it is disabled from taking down or destroying any part of it. The 37th section of the consolidation act declares, that all the property (markets included) of all the municipal corporations within the county of Philadelphia shall be vested in the consolidated city. But this provision is not to take effect until the first organization of the new city councils. Until then, the title to this property remains where it was before, as completely unaffected by the law as if it had never been passed. When it does come into the hands of the new corporation, it must be held for the same uses to which it is now devoted. In the mean time, the power to manage and administer it remains, like the title, unchanged. If it be mismanaged

[Wartman *et al.* *v.* The City of Philadelphia *et al.*]

and maladministered, we are powerless to help it. With every inclination to do so, we find nothing in the law which enables us to interfere.

The action of the councils on this subject was within their jurisdiction, and from their decision upon it there is no appeal, except to the public opinion of the new city. To that tribunal, therefore, we remit all parties.

Motion refused.