# York City *v.* Hatterer, Appellant.

*Municipalities—Markets—Police regulation—Forestalling.*

1. It is the common law of Pennsylvania that every municipal corporation which has power to make by-laws and establish ordinances to promote the general welfare and preserve the peace of the town or city, may fix the time or places of holding public markets for the sale of food, and make such other regulations concerning them as may conduce to the public interest.

2. An ordinance imposing a penalty for purchasing in the public market, during market hours, provisions for the purpose of selling the same provisions again in the same market, is a valid exercise of municipal authority.

*Municipalities—Violation of ordinances—Arrest without warrant—Act of May 16, 1901, P. L. 224, sec. 21.*

3. Where a person has been arrested without warrant or summons for the violation of a municipal ordinance and has raised no question touching the legality of her arrest upon a proceeding to be discharged from custody, but has voluntarily come into court and presented a petition for the allowance of an appeal, she is not in a position to question the constitutionality of the act under which she was arrested.

Argued March 15, 1911. Appeal, No. 22, March T., 1911, by defendant, from judgment of C. P. York Co., Aug. T., 1910, No. 102, dismissing appeal from summary conviction in case of York City v. Emily Hatterer. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Affirmed.

Appeal from judgment of the mayor of the city of York. Before WANNER, J.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was the judgment dismissing the appeal.

*M. S. Niles,* with him *H. C. Niles,* for appellant.—The state may vest in a municipality the right to make necessary police regulations, but it has no constitutional power to delegate to a municipality the function of general legis-

lation: Stoutenburgh v. Hennick, 129 U. S. 141 (9 Sup. Ct. Repr. 256).

The ordinance is not a reasonable exercise either of the police power of the city, or of the power conferred by art. V, sec. 3, paragraph XXX of the Act of May 23, 1889, P. L. 277, "to provide and enforce suitable general market regulations:" Wartman v. Phila., 33 Pa. 202; Mt. Carmel Boro. v. Fisher, 21 Pa. Superior Ct. '643; Barton v. Morris, 10 Phila. 360; Com. v. Brown, 8 Pa. Superior Ct. 339; Stoutenburgh v. Hennick, 129 U. S. 141 (9 Sup. Ct. Repr. 256); Allgeyer v. Louisiana, 165 U. S. 578 (17 Sup. Ct. Repr., 427).

Before the act of 1901, unless the violation of an ordinance provoked a breach of the peace, an arrest without a warrant or summons was unjustifiable: Rarick v. McManomon, 17 Pa. Superior Ct. 154; Shapk v. Wilkes-Barre, 1 Kulp, 73; Phila. v. Campbell, 11 Phila. 163; Pittston Boro. v. Dimond, 7 Kulp, 431; Johnson v. Pittston Boro., 3 Kulp, 244; Com. v. Bowman, 29 Pa. C. C. Rep. 635; Com. v. Krubeck, 23 Pa. C. C. Rep. 35.

*John L. Rouse,* city solicitor, for appellee.—The ordinance was proper: Mt. Carmel Boro. v. Fisher, 21 Pa. Superior Ct. 643; Mayor of Phila. v. Davis, 6 W. & S. 269; Meadville v. Miller, 29 Pa. C. C. Rep. 517.

OPINION BY PORTER, J., October 9, 1911:

The appellant was a huckster and had a stand in a public market of the city of York. The judgment from which she appeals rests on the following distinct finding of facts by the learned judge of the court below. The defendant, on June 24, 1910, during market hours, purchased onions in the Western Market, being one of the markets of the city of York, with the intent and purpose of selling them again in said market, at a stall or stand, then and there occupied by her. The court, upon so finding the facts, adjudged the defendant guilty of violation of a city ordinance prohibiting such act, and imposed the fine author-

ized by the ordinance. The correctness of the finding of facts is not questioned and it is conceded by the appellant that her act constituted a violation of the provisions of the ordinance of the city. The questions involved in this appeal, as stated by the appellant are: (1) "Is an ordinance forbidding forestalling a valid exercise of the police power of a municipality?" And (2) "Is the Act of May 16th, 1901, P. L. 224, sec. 21, providing that policemen of a municipality may, without a warrant or summons, arrest for the violation of an ordinance, constitutional?"

The first question involves the consideration of the power of the state to regulate public markets, and the extent of the authority which it has delegated to cities to establish and regulate such markets, where producers of the necessaries of life may resort to make sales and consumers to supply their wants. The public sale of articles of food has been the subject of police regulation and control from a time very remote and it became a principle of the common law that, in the public markets of a town, the producers of provisions and the consumers thereof should be permitted to deal directly with each other, without the interference of speculators who bought commodities in the market for the purpose of selling them again in the same market. "It is said, that all endeavors whatsoever to enhance the common price of any merchandise, and all kinds of practices which have an apparent tendency thereto, whether by spreading false rumors, or by buying things in a market before the accustomed hour, or by buying and selling again the same thing in the same market, or by any such like devices, are highly criminal at common law, and that all such offenses anciently came under the general notion of forestalling which included all kinds of offenses of this nature:" Hawkins's Pleas of the Crown, bk. 1, p. 644. These offenses against public trade were at a later period treated by statute and "a forestaller" was defined to be one who bought any merchandise, victual, or any other thing

whatsoever coming to any market or fair to be sold in the same, or who induced any person to enhance the price of such commodities in the market, or dissuaded any person from bringing such things to any market: 5 and 6 Edward 6, c. 14. "A regrator" was, by the same statute, defined to be one who did "by any means regrate, obtain, or get into his hands or possession in any fair or market, any corn, wine, fish, butter, cheese, . . . . or any dead victual whatsoever, that shall be brought to any fair or market to be sold, and do sell the same again in any fair or market holden in the same place, or within four miles thereof." This statute was subsequently repealed, but regrating still continued to be an offense at common law, notwithstanding the repeal: Hawkins's Pleas of the Crown, bk. 1, p. 648, sec. 15. "Regrating was described by the same statute to be the buying of corn or other dead victual, in any market, and selling it again in the same market, or within four miles of the same place. For this also enhances the price of the provision, as every successive seller must have a successive profit:" 4 Blackstone, chap. 12, p. 158. The right to open a market was treated in England as a franchise held under the king, to be supported by express grant, or by prescription. In Pennsylvania the right to open or conduct a public market is derived from the commonwealth. The early legislation upon the subject of markets in the city of Philadelphia was considered and commented upon in The Mayor v. Davis, 6 W. & S. 269. The act of March 23, 1786, 2 Sm. Laws 372 had provided that the western moiety of each market house in High street should be left free to the country people, the stalls of the other moiety were to be rented; the act of Feb. 12, 1795, 3 Sm. Laws 197, made it unlawful for any person whatever to sell any beef in the western moiety of the market; and the act of March 19, 1810, 5 Sm. Laws 118, provided that the western moiety of this market should be let to such persons from the country who send or carry their produce to market, and to no others, provided, that the annual rent

do not exceed $20.00 the stall. The city had passed an ordinance imposing a penalty for selling meat in the western moiety of the market, under the authority of the act of 1795, and the defendant was prosecuted under that ordinance for selling beef in the western moiety of the market. It was an admitted fact in the case that the defendant had fatted and slaughtered upon his own farm the animal, the carcass of which he sold at his stall, and his contention was that this was the produce of his own farm. The Supreme Court sustained the conviction, saying: "The ox is the produce of the farm; beef is the produce of the slaughter house and the shambles." The question of the right to buy in the market and sell again in the same market was, of course, not involved in that case, but the decision established the principle that it is within the police power of the state to ordain that one-half of a public market house of a city shall be left free to such persons from the country as carry or send the produce of their own farms to the market, or that they shall be entitled to possession of stalls at a fixed rate per year, while all others are excluded from that part of the market, as sellers. The legislature at that early date thus discriminated between those who sold their own product and those who were mere dealers. The Act of April 6, 1802, 3 Smith's L. 530, provides: "It shall and may be lawful for any person or persons to sell or expose for sale provisions, vegetables or fruit, in the markets of any city, borough or corporate town within this commonwealth. Provided always, that such provisions, vegetables or fruit shall not have been previously purchased within the limits of such city, borough or corporate town." The commonwealth has thus established a distinction, so far as the right to sell in the public markets of cities and towns is concerned, between those persons who sell their own produce, or the provisions which they have brought from a distance, and those persons who wish to sell provisions which they have bought in the same city where the market is located. Can it be said that a city ordinance based upon a classification thus adopted by the

commonwealth and founded upon substantial differences in the manner in which the parties do business, is unreasonable?

"The necessity of a public market, where producers and consumers of fresh provisions can be brought together at stated times for the purchase and sale of those commodities, is very apparent, there is nothing which more imperatively requires the constant supervision of some authority which can regulate and control it. . . . It can never be so well placed as when it is put into the hands of the corporate officers who represent the people immediately interested. A municipal corporation, comprising a town of any considerable magnitude, without a public market subject to the regulation of its own local authorities, would be an anomaly which at present has no existence among us. The state might undoubtedly withhold from a town or a city the right to regulate its market, but to do so would be an act of mere tyranny and a gross violation of a principle universally conceded to be just, that every community, whether large or small, should be permitted to control, in their own way, all those things which concern nobody but themselves. The daily supply of food to the people of a city is emphatically their own affair. It is true, that the persons who bring provisions to the market have also a sort of interest in it, but not such an interest as entitles them to a voice in its regulation. The laws of a market (I am now using the word in its larger sense) are always made by the persons who reside at the place, and that whether they be buyers or sellers. It is, therefore, the common law of Pennsylvania, that every municipal corporation which has power to make by-laws and establish ordinances to promote the general welfare, and preserve the peace of a town or city, may fix the time or places of holding public markets for the sale of food, and make such other regulations concerning them as may conduce to the public interest:" Wartman v. Philadelphia, 33 Pa. 202. It was in that case held that the city might at any time remove the

public market from one place to another. This court recognized and enforced the principles thus stated in Mt. Carmel Borough ·v. Fisher, 21 Pa. Superior Ct. 643.

The Act of May 23, 1889, P. L. 277, "Providing for the incorporation and government of cities of the third class," expressly conferred upon such cities power "To purchase and own grounds for, and to erect and establish market houses and market places; for which latter purpose parts of any street or side-walk may be temporarily used, and to provide and enforce suitable general market regulations." That statute also conferred upon such cities authority to make such ordinances, by-laws, rules and regulations, not inconsistent with the constitution and laws of this commonwealth, as may be expedient or necessary for . . . . the maintenance of the peace, good government and welfare of the city, and its trade, commerce and manufactures: art. V, sec. 3, paragraphs XXX and XLVI, pp. 291 and 294. There can be no question, therefore, that the city of York was vested with authority to regulate and control this public market, which the court below found to be "one of the markets of the city of York." The ordinance of which the appellant complains is not inconsistent with the constitution and laws of this commonwealth. The appellant, however, asserts that the ordinance is unreasonable. An ordinance cannot be declared invalid upon this ground unless it be made to appear that the regulation is clearly unreasonable. It was said of public markets, in Wartman v. Philadelphia, 33 Pa 202, that the municipality may "make such regulations concerning them as may conduce to the public interest." The regulations which the city is authorized to make are to be made in the interests of the public, to enable the inhabitants of the city to supply their wants in the public market, and they are not to be made for the promotion of the interests of any individual dealer. The reasonableness of a rule which excluded hucksters from a public market was recognized and sustained by Judge SHARS-WOOD, when sitting in the district court of Philadelphia,

in Hughes v. The Farmers' Association, 1 Philadelphia, 338. The plaintiff had in that case been excluded from the market and brought an action to recover damages. The learned jurist in his opinion said: "Besides which, the act recites, that the association to whom the corporate franchise is granted are agriculturists; and the plaintiff complained, that though he was a farmer, he was excluded by a regulation which prevented hay and straw dealers—evidently hucksters, who bought and sold—from entering the premises for the purpose of selling hay and straw. . . . The corporation has express power to make by-laws for ordering all their concerns, and it is difficult. to see how such a regulation or by-law as that complained of here was inconsistent with the constitution and laws of the United States, or of this state. The corporators were agriculturists, and admitting that the market was intended not merely for the corporators, but farmers generally, it was not an unreasonable rule to say, that the sellers in the market should be confined to those who brought there the produce of their own farms for sale, and that others who, besides that, were engaged in the business of buying and selling, and by large capital invested in such operations, could overstock the market when they pleased, should be excluded." The rule was thus held to be reasonable upon the ground that its purpose and effect was to prevent the manipulation of prices by hucksters, who were neither producers nor consumers. The effect of the act forbidden by a regulation upon the price of commodities in that market is, therefore, proper to be considered, in determining whether a market regulation is reasonable or unreasonable. The market in which this appellant bought, during market hours, with the intention of selling again the same article in the same market, was a public market of the city of York, an institution dedicated to public use, and it was entirely competent for the municipality to adopt such regulations as would prevent speculation by dealers, during the regular market hours. The defendant had no vested right

to sell in the markets of the city of York, for she was not within the provisions of the act of 1802, above quoted. Her right to sell was subject to such reasonable regulations as the city might ordain. If those engaged in the business of buying and selling, by the investment of large capital in such operations, could during the market hours denude the market of all provisions offered by producers, and if they then had the right in the same market to sell the same provisions, they might thus reap profit for themselves, but such operations would be manifestly prejudicial to the interests of the public. We are of opinion that an ordinance imposing a penalty for purchasing in the public market, during market hours, provisions for the purpose of selling the same provisions again in the same market, is a valid exercise of municipal authority.

We decided nothing in the case of Central Market Co. v. Erie, 44 Pa. Superior Ct. 191, which is not in harmony with this view. The plaintiff in that case was a corporation created under the general act of April 29, 1874, P. L. 73, and the supplements thereto and the case involved the question of the effect of the ordinance upon private property. It was well shown by our Brother HEAD, who wrote the opinion in that case, that when a private corporation undertakes to conduct a market house for the sale of provisions, it becomes subject to the supervision and control of the police power of the municipality in which the market is maintained. The extent of the power of supervision possessed by the municipality over a market maintained by a private corporation was commented upon in Strickland v. Pennsylvania Railroad Co., 154 Pa. 348, and there can be no question that the municipality does have power of general supervision over the market house of a private corporation, during the time that a public market is maintained therein. The property of such a private corporation, so maintaining a market, is not, however, dedicated to public use, and the municipality does not have the same control over that property, at least outside of

the regular market hours, that it is authorized to exercise over a market which has been established and maintained by the municipality. The city has a right at any time to move from one place to another a market which has been established and maintained by the municipality. This it cannot do with a market owned by a duly incorporated private company, the private corporation cannot be compelled by the municipality to keep its market house open at any time; the corporation may sell or rent its property, at its own option: Twelfth St. Market Co. v. Railroad Co., 142 Pa. 580. In the case of Central Market Co. v. Erie, 44 Pa. Superior Ct. 191, the market company joined with others in filing a bill to restrain the city from enforcing an ordinance which was very general in its terms. The opinion in that case clearly shows the scope of the ordinance with which it dealt: "It provides that it shall be unlawful to purchase or sell provisions within or about the market place for the purpose of selling the same. There is no qualification as to character, time, manner or extent of the sales forbidden except that contained in the words quoted." That ordinance was, in all the respects mentioned, essentially different from the one with which we are now dealing. The present ordinance prohibits purchases for the purpose of selling again only "before or during the market hours." If this ordinance were applied even to a market owned by a private corporation its operation would be not only confined to the regular market days, but to those hours of that day ending with the closing of the public market. Upon all other days and upon the part even of market days subsequent to the regular market hours, all persons would be perfectly free to buy and sell as they might see fit. These considerations distinguish the ordinance dealt with in Central Market Co. v. Erie from that upon which we are now called to pass.

We are not in the present case called to pass upon the question of the constitutionality of the Act of May 16, 1901, P. L. 224, sec. 21, providing that policemen of a

municipality may, without a warrant or summons, arrest for the violation of an ordinance; and upon that question we express no opinion. The defendant might have raised any question touching the legality of her arrest upon a proceeding to be discharged from custody, but having voluntarily come into the court below and presented her petition for the allowance of an appeal, she is not now in position to raise such questions: Commonwealth v. Brennan, 193 Pa. 567; Commonwealth v. Dingman, 26 Pa. Superior Ct. 615.

The judgment is affirmed.