HARRY C. WESLEY, as Committee of the Person and Property of S. EDWARD DODGE, an Incompetent Person, Re-ˋ spondent, *v.* BEAKES DAIRY COMPANY, Appellant.

(County Court; Oneida County, May, 1911.)

Assignments — Constructive assignment — In general.
Payment — Mode and sufficiency of payment — To whom made — Assignor or assignee.
Process — Service — Service on corporations — Managing agent.

> The foreman of a local milk station or cheese factory belonging to a corporation, having charge of the station in the absence of any superior corporate authority and vested with managerial powers, sometimes receiving directions from the principal office

and the corporate officers there, but exercising discretion in the transaction of business, is a managing agent within the provisions of section 431 of the Code of Civil Procedure relating to the service of process.

Where the owner of a stock farm leases it, with the cows, and the lease provides that the landlord is authorized to collect all cheese checks from the factory whenever due, from a certain day until he shall have collected a certain amount and, if the cheese checks are insufficient to pay the rent, that the landlord is authorized to collect the canning factory checks for the remainder, such provisions bestow upon the landlord a power coupled with an interest, which is irrevocable, and amount to a virtual assignment of the moneys represented by the checks.

Where, in such a case, the company that buys milk disregards the notice of the landlord containing information of his rights and turns over the checks to the tenant, the landlord may recover from the company the moneys represented by such checks.

APPEAL, on question of law, from a justice's judgment rendered in favor of the plaintiff.

D. F. Searle, for appellant.

McMahon & Larkin, for respondent.

HAZARD, J.    The first point that is raised by appellant is that the justice who rendered the judgment herein had no jurisdiction, because it is claimed that the summons was not served upon a " managing agent " of the defendant.   It seems that the defendant is a New York State corporation, having its principal office in New York city.   It maintains a " milk station " or " cheese factory " at Verona in this county, and the summons was served upon J. R. Burleigh, who appears to be in charge of that institution.   It is claimed by the appellant that Burleigh was only a foreman, not having any managerial powers, and that, therefore, the service of the summons upon him was not sufficient to give jurisdiction to the justice within the provisions of section 431 of the Code of Civil Procedure.   It will be observed that the phraseology of that section requires that service be made, if upon an agent, upon a " managing agent," and the question is thus raised as to whether Burleigh is within the require-

ments of the statute. Burleigh · testified that he was the "foreman" of the defendant company, and that he was in charge of the station "when there is no one else there." There was considerable testimony taken as to his status, but I think it is fairly established that he was in charge of the station and vested with managerial powers. It does not appear that there was anybody else there to take charge and give directions, but it does appear that he sometimes received instructions from the head office of the company and from its officers, one of whom was located at Middletown, N. Y. He seems to have employed such help as was needed and contracted with the various farmers for their milk. It appears that he employed an attorney for the defendant in this action, and that he verified the answer interposed. In his affidavit he states that he is "the agent of the defendant." It is doubtless true that in doing the foregoing things he acted more or less under general directions emanating from headquarters at New York or Middletown; but it seems from all the evidence in the case that he was acting in a general managerial capacity, and that he was in charge of the defendant's station at Verona, and was the head man there; and I think it may be fairly inferred that he exercised a certain amount of discretion in transacting its business, and was in fact its general representative empowered to transact its business at that point. I do not apprehend that the fact that he might have received orders from headquarters as to the general conduct of the business deprives him of the character of a "managing agent."

The case of Vitola v. Bee Publishing Co., 66 App. Div. 582, is cited by appellant. That case holds that an advertising agent representing the defendant in another State, as well as some other newspapers, simply in the business of soliciting advertisements for them, did not make him a managing agent; and I do not think that that case is controlling, the party served in that case having no authority to do anything except to procure advertisements.

In the case of Kramer v. Buffalo Union Furnace Co, 132 App. Div. 415, the decision seems to turn upon the fact that the party served, who was an "assistant superintendent,"

was at the time of the service and at all times, as his official
title implies, simply an assistant or *subordinate* acting upon
orders from a superior, who was as shown by the papers in
the case present in his office in the same building, when and
where the papers were served. It appears that the assistant
had the oversight of some 400 men, but he was acting all the
time under a superior then and there present. It is not, it
seems to me, the *extent,* but the *quality* and the *nature* of
the employment or agency which governs. In the Kramer
case just cited, while the agent had perhaps very many more
men under him than Burleigh had, the decision seems to turn
upon the point that he himself was only a go-between, acting
under orders from a superior then and there present; and
the decision seemed to be that the summons in that case
should have been served upon the superior who doubtless
was a "managing agent;" the other was merely his assistant.

In Taylor v. Granite S. P. Association, 136 N. Y. 343,
it was shown that the summons was served upon an attorney
at law whose only connection with the defendant was that of
attorney of record for it in a foreclosure case, and it was held
that service upon him did not give the court jurisdiction of
the defendant.

In Coler v. P. B. Co., 146 N. Y. 281, the court said: " It
is not necessary that the office of the person to whom the
summons is delivered   *   *   *   should be precisely de-
scribed as that of ' a managing agent; ' because, as we think,
from the language of section 432 of the Code of Civil Pro-
cedure, it was intended that any person holding some
responsible and representative relation to the company, such
as the term ' managing agent' would include, might be
served with the summons."

In that case it appeared that the party served was a resi-
dent of Chicago, and his relations to the company were not
at all clearly established, for which reason, owing to the un-
certainty prevailing with reference to the status of the par-
ties served and the absolute want of proof with reference
thereto, the court contended it " a wiser and better rule to
adopt that the right to maintain the action has not been
acquired."

I think that all of these cases are to be differentiated from the case at bar and that I must hold that Burleigh was a "managing agent" within the terms of the statute, and that, therefore, the justice acquired jurisdiction of the defendant by the service of the summons upon him.

This action was brought to recover the price of milk delivered to the defendant during the summer of 1910. It appears that S. Edward Dodge, the incompetent person represented by the plaintiff, entered into a lease dated December 31, 1909, with one John N. Wood, in and by which Dodge leased his farm in the town of Verona in this county to Wood at the annual rental of $425. The lease provides: " The said first party thereupon agrees to furnish the use of 10 cows for and during said term. It is further agreed and provided that the said second party shall pay his rent for said premises as follows: First party is hereby authorized to collect all cheese checks from the factory whenever due from the first day of July, 1910, until he shall have collected the amount of $425. If, however, the said cheese checks are not sufficient to pay all of said rent, then said first party is hereby empowered to collect the Canning Factory checks for any remainder of unpaid rent." Further on, the lease provides: "And provided the said party of the second part shall fail to pay said rent or any part thereof when it becomes due, it is agreed that the said party of the first part may sue for the same or re-enter said premises or resort to any other legal remedy."

It is claimed by the respondent that the above quoted provisions vested the title to the money due from the sale of the milk from the farm in Dodge, the landlord, while the appellant claims with great earnestness that the language quoted cannot be given that effect, but that it amounts to an agreement that, if Dodge did not succeed in getting his money by way of the cheese checks or the canning factory checks, he simply had recourse to the agreement to sue or re-enter; and the very interesting question is thus presented as to who had title to the funds in the defendant's hands. It is urged by the appellant that the language quoted cannot be held to amount to an assignment, and that the agreement to

be gathered from the whole instrument is to the effect that
Wood might or might not permit Dodge to receive the cheese
checks, and that in the latter case Dodge's only remedy was
by recourse to that provision which said he " may sue for the
same, or re-enter said premises, or resort to any other legal
remedy." Incidentally it may be mentioned that it appears
that the defendant has paid over all of the money, partly to
Wood and partly to Alva Burdick, his father-in-law. It will
be noted that the landlord was authorized to collect cheese
checks " whenever due from the first day of July, 1910," etc.
On the 5th day of July, 1910, John Wood, the tenant, gave an
instrument in writing to his father-in-law, Alva Burdick,
reciting a consideration of $1,000 and being in the general
form of a bill of sale, in and by which he granted and con-
veyed to the party of the second part " my dairy of five cows
and the bull now on the S. E. Dodge place in the said Town
of Verona; my entire crop of peas and the proceeds there-
from with the exception of the amount which I have given
an order for to J. J. Bartholomew & Son; my entire crop of
hay, corn, cabbages, oats, and all other products on the farm
which I am entitled to; also all my personal property consist-
ing of tools, fixtures and harnesses," etc.

It appears that the milk checks for the months of June
and July (paid in the subsequent months) were received and
appropriated by Wood, and that the milk checks for the re-
maining part of the season were claimed by Burdick under
the last quoted paper above set forth, which is known in the
case as Exhibit B, and that he, Burdick, later in the season
of 1910, brought a suit against this defendant for the balance
of the milk money and recovered a judgment by default, and
that that judgment has been paid by the defendant; so that
the defendant in this action has actually paid to some one
other than Dodge, the landlord, all of the money accruing
from the season's milk. It is urged that the judgment ob-
tained by Burdick is a bar to the recovery by this plaintiff
for so much of the milk money as it was rendered for, but
I do not think that that judgment can be so considered, as
neither Dodge nor this plaintiff, his committee, were parties
to that action.

County Court, Oneida County, May, 1911. [Vol. 72.

In Schrauth v. Dry Dock Savings Bank, 86 N. Y. 394, Judge Earl said: "It can never be a defense that one who owes me money has, by an order or judgment of a court in a proceeding to which I was not a party, been compelled to pay or deliver the money to another." I, therefore, reach the conclusion that the judgment obtained in the Burdick case is of no binding force here.

We come now to the question of whether the incompetent represented by the plaintiff is or is not the owner of the fund accruing from the delivery of the milk at the defendant's station, which involves a construction of the language quoted from the lease and a decision of its legal effect upon the ownership of the milk or the fund resulting from its sale to the defendant.

We start out with the fact that the farm in question belonged to Dodge, the incompetent person, and that seven of the ten cows (as shown by the evidence) were Dodge's. It seems to me that the provision quoted amounts to a *reservation* of title in the landlord to the proceeds of the dairy. It is doubtless true that, in the ordinary relation of landlord and tenant, the products of the farm belong to the tenant; but it is also true as a legal proposition that the landlord may reserve title to those products, either as security for the payment of the rent, or as the rent itself.

The Court of Appeals said in Andrew v. Newcomb, 32 N. Y. 419: "The owner of land may lawfully contract for its cultivation, and may provide in whom the ownership of the product shall vest." Later on in the same case (p. 420) the court said: "The flax was at all times the property of Ray. This title was original and did not arise out of a purchase from Reed."

In McCombs v. Becker, 3 Hun, 343, the court said: "It was entirely competent for the defendant and his tenant to agree that the hay to be raised upon the demised premises should be and remain the property of the defendant until the rent should be paid, and the conditions of the lease satisfied by the tenant. Instead of the tenant mortgaging the crop to be grown, as security for the rent he may agree that the crop shall be the landlord's, until the rent be paid. In the one

case the agreement is, that the crop shall be the landlord's if the tenant does not pay the rent; in the other, that it shall not be the tenant's property until he does pay for it."

Now it seems that it is a fair construction of the lease that the landlord reserved the title to himself in the milk checks. His right to do so cannot be questioned under the decisions just quoted. His rights in the premises were at least equal to those of his tenant's.

In construing an instrument, the surrounding circumstances may be considered in reaching a decision as to the intention of the parties. Susman v. Whyard, 149 N. Y. 127.

In considering their respective situations at the time they made the lease, it will be borne in mind that Dodge owned the farm and most of the stock. The tenant was simply to furnish the labor, and it does not seem to me ·to be at all unreasonable to assume that they intended to provide by contract that the landlord should have and own the proceeds of the dairy up to the extent of his rent. Neither does it seem likely that that contract was intended to be an arrangement whereby the question of whether the landlord should receive the milk checks or not rested in the pleasure or discretion of the tenant. It is true that the lease contains in one of the final and formal paragraphs the usual provision that, if the tenant shall fail to pay the rent or any part thereof when it becomes due, the landlord may sue for the same or re-enter said premises or resort to any legal remedy. The lease is very carelessly drawn, with an utter disregard to punctuation and all of the other features which go to make up a properly prepared legal document. The words quoted and relied upon by appellant are usual to all leases, and it is doubtful if they were intended to represent an agreement that, if the tenant did not see fit to allow the landlord to receive what he, the tenant, had agreed that he should, the landlord's only recourse was to sue the tenant or re-enter, both of which provisions would be of little or no value to the landlord. Furthermore, it will be observed that there was no time fixed for the payment of the rent, except as it was provided that he should receive the proceeds from the factory " whenever due from the first day of July, 1910." If some force and effect

is to be given to the formal provision quoted, it might be said that it was intended to become effective in case of a shortage or insufficiency of the cheese money and canning factory money, or might be intended to apply in case of the tenant failing to deliver milk at the milk station or vegetables to the canning factory. I am unable to say myself that the landlord intended to permit his tenant to receive the milk money and have the option as to whether he, the landlord, should receive it or not.

There is another view of the case in which the title to the milk money might be claimed to be in the landlord, even assuming that it was not intended to reserve title therein to the landlord, or that the lease did not legally affect that result, and that is that the authority contained in the lease amounts to *a power coupled with an interest,* which would be irrevocable, and which, if it *is* a power coupled with an interest, would have given to Dodge, the landlord, the sole right to receive the funds and operated as an assignment of the funds. Hunt v. Rousmanier, 8 Wheat. 174; Babrowsky v. United States Grand Lodge Order Brith Abraham, 129 App. Div. 695; Terwilliger v. Ontario, C. & S. R. R. Co., 149 N. Y. 86.

It seems to me that these cases clearly enough establish the propositions that, *first,* the lease constituted what is called in the Babrowsky case a "virtual assignment;" *second,* that, as held in the Rousmanier case, the authority to receive the milk checks was "a power coupled with an interest," and *third,* that, as held in all the cases cited, the conveyance, assignment or power, whichever it may be called, was irrevocable.

Appellant has cited a number of cases in support of his contention, among which is that of Addison v. Enoch, 48 App. Div. 111. That was a case which was described by the court as a promise " to pay a sum of money to the payee out of a particular fund when it should be received by the obligors;" and the court held that such an agreement is not sufficient to create either an equitable lien upon the fund, or to operate as an assignment thereof. As I do not believe that it was intended between these parties that Wood should

ever handle the fund, or that he had any right whatever to receive it, I do not think the case just cited is in point.

Donovan v. Middlebrook, 95 App. Div. 366, has some material points of difference from the case at bar. In that case the alleged assignee had no proprietary interest in the subject-matter of the assignment, except as it might have been conveyed to him by the particular instrument in question. In that respect the Donovan case differs from the one at bar, because Dodge certainly had proprietary interests in the first instance in the products of his farm and dairy, which according to my view he never parted with or intended to part with. In the Donovan case, also, the form of the instrument involved is peculiar, it simply saying, " I agree that Horwitz is entitled to ½ of the commissions," etc. The court said that at most this was an agreement on the part of Toch to pay Horwitz one-half of what he was to receive when he got it. The situation of the parties, the facts and language used, all represent so many points of difference to the case at bar that I do not regard it as decisive on the questions of ownership of the milk checks involved in the present case.

The point is raised by appellant that the lease provides for " cheese checks from the factory;" and, as it appears that no cheese was made at defendant's station or factory during the months for which plaintiff makes this claim, appellant contends that plaintiff is not entitled to recover. I do not think that this contention can be allowed to prevail. It is a mere quibble over the phraseology of a loosely drawn instrument. Furthermore, it appears that defendant's station is equipped for the manufacture of cheese, and that during some months of the year it is made there. It is fundamental that in construing contracts the intention of the parties is to be given effect; and it seems to me to be absolutely clear that it was their intention that the landlord should have the proceeds of the milk which was to be delivered to defendant, whether defendant made cheese out of the milk or sent it on to New York for consumption.

Appellant also contends that it should not be held liable in any event for the sum of fifty-seven dollars and seventy-five cents, which it is undisputed was the amount of the June

milk. It is claimed by the appellant that the wording of the lease is such that in no event could the landlord receive funds for the milk delivered prior to the 1st of July, 1910, while respondent claims that he is entitled to the funds coming due after the 1st day of July, 1910. It appears that it was customary for defendant to pay for each month's milk sometime well along toward the latter part of the following month, and it also appears that the June milk was actually paid for (to John Wood) by check of defendant dated July 20, 1910. Upon referring to the lease we find the language in that connection to be as follows: " First party is hereby authorized to collect all cheese checks from the factory, whenever due, from the first day of July, 1910, until he shall have collected the amount of $425.00." While, in view of the fact that defendant has already paid this money once, I should not be disposed to hold it up to undue hardship, yet it seems so absolutely clear to me that the intention and meaning of the parties were, not to collect for *milk delivered* from the first of July, but, to again quote the language involved, " to collect all cheese checks from the factory whenever *due from the 1st day of July, 1910*," that I find it impossible to accept appellant's views; as it seems absolutely clear to me that it was the plain intention of the parties that all funds *coming due from the factory* after July 1, 1910, were to go to the landlord, and I must so hold.

In a sense it is undoubtedly a hardship to this defendant to have to pay for the milk received by it from the Dodge farm during the season of 1910 twice; but it seems to have deliberately gotten itself into this trouble, as it admits in its answer that a notice of the landlord's rights in the premises was served upon it on July 7, 1910, nearly two weeks before it paid for the June milk.

The only basis of Burdick's claim to the milk money arises from the bill of sale; and, although that document seems to have constituted a sufficient basis for such a claim in defendant's opinion — or at least it has accepted it as such and acted upon it — a perusal of that paper does not seem to warrant such a conclusion. That paper transfers to Burdick Wood's part of the dairy, his crop of peas and " my entire

crop of hay, corn, cabbages, oats, and all other products of the farm *which I am entitled to."* It will be noted that the proceeds of the dairy are not specifically mentioned; and, if there was any intention to convey the same, it must have been expressed in the phrase " and all other products of the farm which I am entitled to." Now it seems so very clear that Mr. Wood was not "entitled to" the proceeds of the dairy, as to raise the most serious kind of a question as to whether he even intended that the proceeds of the dairy should be included in that conveyance. Certainly he did not say so, and I do not think we should assume that Wood was selling or endeavoring to sell something that he had no right to and was not entitled to sell. It, therefore, seems to me that Exhibit B furnishes a very precarious foundation of title to the fund in question on the part of Mr. Burdick.

The point is made by appellant that, the landlord having failed to file his lease as a chattel mortgage, the same is void as to this defendant. That can hardly be so. Whatever might be the status of affairs with reference thereto as between Burdick and this plaintiff, the defendant, the Beakes Dairy Company, certainly is not a subsequent incumbrancer or purchaser for value; and I do not see how the filing, or failure to file, the lease in question has any bearing upon the present case. Furthermore, even as between Burdick and this plaintiff, the question of the filing of plaintiff's lease is, I think, not material. It appears that the consideration for the transferring to Burdick was a pre-existing debt of $1,000, and, therefore, Burdick, " having merely given credit for the value of the goods upon a pre-existing debt, was not a subsequent purchaser or mortgagee in good faith within the statute." This is especially true as it does not appear that his debt " was actually and absolutely released or extinguished by the transaction." Button v. Rathbone, Sard & Co., 126 N. Y. 192.

The appellant contends that the costs are unduly large, as contained in the justice's judgment; and an amended return has been ordered and filed, showing the items thereof. Among the items appears one for " Joining issue, $1.50," for which I find no warrant. There are also items of one

dollar and fifty cents each for "one day's trial fee" upon January 6, 1911, and on January 13, 1911, upon both of which days it appears that no evidence was taken or argument made or anything else done besides taking adjournment. I, therefore, disallow these three items, amounting to four dollars and fifty cents. The amount of costs contained in the judgment was fifteen dollars, but the aggregate of the items in the amended return is nineteen dollars and thirty cents. It appears, however, that the correct amount of costs is fourteen dollars and eighty cents.

Judgment affirmed, with costs to respondent, except as to the item of justice's costs, which may be reduced by twenty cents.

Judgment accordingly.