(90 Misc. Rep. 568)

## CASE v. PLOUTZ et al.

(Schoharie County Court. March, 1915.)

1. JUSTICES OF THE PEACE ⬅⇒185—APPEALS—COUNTY COURT.

Under Code Civ. Proc. § 3063, conferring upon county courts authority to reverse judgments of the justice court because contrary to, or against the weight of, the evidence, a judgment of the justice should not be reversed unless it is so plainly against the weight and preponderance of proof that he could not reasonably have arrived at that decision.

[Ed. Note.—For other cases, see Justices of the Peace, Cent. Dig. §§ 716–720; Dec. Dig. ⬅⇒185.]

2. LANDLORD AND TENANT ⬅⇒246—FARM LEASES—"PRODUCTS OF FARM."

A contract for the working of plaintiff's farm on shares provided that until a division of the crops and products of the farm all such products should belong to and be the property of plaintiff as security for advances to his tenant. About the end of the term, plaintiff claimed the tenant was indebted to him, and a division was had, at which time plaintiff had possession of the young cattle in question and claimed them as his property. Defendant claimed the cattle under a chattel mortgage given by the tenant of the farm, and they were removed from the field in which plaintiff put them. *Held*, that such young cattle, which were part of the increase of the cattle on the premises, were "products of the farm" within the lease contract, and hence, the tenant, being indebted to plaintiff, title remained in plaintiff.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 991–1002; Dec. Dig. ⬅⇒246.

For other definitions, see Words and Phrases, First and Second Series, Farm Products.]

Appeal from Justice Court.

Action by James M. Case against William Ploutz and another, begun in Justice Court, where judgment was rendered for plaintiff, and defendants appeal. Judgment for plaintiff affirmed.

O'Connor & O'Connor, of Hobart, for appellants.
C. E. Nichols, of Jefferson, for respondent.

BEEKMAN, J. This is an appeal from a judgment rendered by a Justice's Court upon the verdict of a jury in favor of the plaintiff and against the defendants. The plaintiff brought action against these defendants, claiming that they had taken certain young cattle belonging to the plaintiff and converted them to their own use. The plaintiff's claim was that, by virtue of a certain written contract made by the plaintiff and one Fritz Ploutz, he retained the title to the animals. The defendant William Ploutz claimed the right to take the animals under a chattel mortgage alleged to have been given to him by his father, Fritz Ploutz. It was conceded on the trial that the defendants removed the animals from the field in which the plaintiff had placed them.

There was a large amount of testimony taken covering the transactions between the plaintiff and Fritz Ploutz, the tenant on plaintiff's farm, concerning the amount of property and money advanced and loaned to the tenant, amounts paid for feed, the amounts credited to the plaintiff or charged to the tenant, and the amount of the indebtedness of the tenant to the plaintiff growing out of the farm contract.

⬅⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The written contract made by the plaintiff and Fritz Ploutz purports to run from October 15, 1911, to October 14, 1912, and provides for the working of plaintiff's farm on shares. The contract is on a long printed form, with some printed provisions erased and with some additions in handwriting as to various matters appropriate to the condition of the farm and the manner in which it was to be worked. The plaintiff testified that he read the entire contract, both the printed and written provisions, to the tenant before the same was executed, and the jury evidently gave credence to that testimony. The contract provides in great detail for the manner of working the farm, the running of the dairy (a large number of cows having been placed thereon by the plaintiff, and a few cows having been placed thereon by the tenant), the arrangements for delivery of milk to the creamery, the making out of the checks for milk to the plaintiff until he shall be paid in full for all money advanced by him for feed or other material for the farm, the privileges which the tenant was to have as to poultry, garden, milk for his family, payment of taxes, and many other particulars which it is unnecessary to state. The jury had the opportunity of observing the witnesses and forming their opinions as to their credibility, and from the testimony the jury were justified in finding that the tenant was indebted to the plaintiff on account of matters growing out of the contract.

[1] The facts were peculiarly for the determination of the trial court, and after a careful consideration of the evidence it does not seem to me that under the entire case there is a preponderance of evidence in favor of the defendants to justify a reversal on the ground that the verdict is contrary to or against the weight of evidence.

"It is manifest that the authority conferred by section 3063 of the Code upon County Courts to reverse a judgment of a Justice's Court because it is contrary to or against the weight of evidence is to be exercised only when the judgment is so plainly against the weight and preponderance of proof that it can be seen that the justice could not reasonably have arrived at the decision which he made. The County Court by this provision of the Code has no greater power over judgments rendered by justices of the peace than has the Appellate Division and Court of Appeals over judgments of courts and referees. * * * 'A court on appeal cannot set aside the findings of the trial court merely because they are of opinion that, upon the record before them, they would feel constrained to find the fact the other way.'" Murtaugh v. Dempsey, 85 App. Div. 204, 205, 206, 83 N. Y. Supp. 296, 298; Clinton v. Frear, 107 App. Div. 571, 573, 95 N. Y. Supp. 321; Vandeymark v. Corbett, 131 App. Div. 391, 394, 115 N. Y. Supp. 911.

Furthermore the spirit and letter of section 3063 should be observed. "The appellate court must render judgment according to the justice of the case without regard to technical errors or defects which did not affect the merits."

[2] Whether the judgment shall stand depends mainly upon the construction which shall be placed upon the rights of the plaintiff and the tenant under the following provisions:

### "Division of Products.

"Each party shall have for his own one-half of all the products of said farm, to be divided at the barns on the premises; grain, corn, beans and potatoes in the half bushel; hay in the stack or mow; wool by the pound at the barn;

apples by the barrel and bushel in the orchard. All corn stalks, bean fodder and straw are to belong to and be the property of the party of the first part, but party of the second part may, during said term and at no other time, feed the one-half thereof to his cows, horses, sheep and cattle, as hereinafter provided. If either party neglect to attend a division of the products of the farm after three days' notice, in writing, personally or by mail, the other party may, in the presence of a witness, not a relative of either party, make such division as above set forth. Each is to have one-half of live stock raised on farm and one-half of butter, milk, etc.

#### "Title to Crops.

"It is further mutually agreed that until a division of the crops and products of said farm, all the crops and products thereof shall belong to and be the property of the party of the first part as his security for the faithful performance of this contract by and on the part of the party of the second part, and as security for any advances or loans made to party of the second part, and for any seed, plaster and phosphate beyond or in excess of one-half furnished, bought or paid for by party of the first part, and that upon any division of said crops or products, party of the first part shall own and be entitled, in addition to one-half thereof, to a sufficient amount to repay him all advances and loans made to party of the second part, and for all seed, plaster and phosphate in excess of one-half thereof, bought, furnished or paid for by said party of the first part. Each is to have butter for his family use only out of his own share of butter."

At about the end of the term of the contract, the plaintiff claimed, and the evidence so shows, that the tenant was indebted to him under the terms of the contract, and a division was had on or about October 14, 1912, and plaintiff had possession of a calf and four yearlings, claiming the right to them as his property under the provisions of the contract.

Thereafter animals were taken by defendants from the possession of plaintiff under the claim that on October 7, 1912, Fritz Ploutz had given William Ploutz a chattel mortgage thereon.

Defendants claim that the words "products of said farm" do not include the calf and four yearlings; that is, that the young stock cannot be considered "products of the farm," and that therefore the plaintiff had no title to them by virtue of the contract or the advances and loans made to the tenant. It will be noticed that under the head of "title to crops" the words "crops and products" are used, thereby meaning that, aside from the crops which might arise directly from the soil, there were other "products" which would be the result of the conduct of the farm, and the care of the stock thereon. The word "products" must certainly include what was growing into the property as the result of the farm. This young stock would, of course, be fed upon the pasture and the hay and fodder grown upon the farm, and the amount of pasturage, hay, straw, and fodder consumed by the calves would lessen by so much the property to be divided by the parties. The crops of the farm being consumed by the young stock simply converted the crops into another form of products of the farm.

The principal value of the calf is in the raising of it by the transmuting of the grass and other crops of the farm into a form more marketable and of greater value. Frequently where a farm lies distant from a market, it is the practice of good farmers, instead of drawing their hay or other crops a great distance, to keep young stock and feed up their crops on the farm, and then sell the stock when it has come to

maturity. In case a farm should be entirely devoted to the rearing of calves and young stock, and bringing them to maturity on the crops of the farm, the resulting stock would be practically the only "product of the farm." In case a farm should be devoted in part to the raising of grains, in part to the production of dairy products, and in part the rearing and bringing to maturity of calves and young stock, the products would be of the three kinds, grain, dairy products, and live stock.

On the argument the defendants' attorneys cited the case of Mayor v. Davis, 6 Watts & S. 269, decided in the Supreme Court of Pennsylvania in 1843, holding that the words "produce of the farm" did not include "beef." An examination of that case shows that it was an action brought by the city of Philadelphia to recover the penalty for an alleged violation of an ordinance of the city, providing that the penalty imposed upon any person or persons for selling beef in the western moieties of the market house shall be $6. The defendant in that case . claimed that, under a statute which provided "that the western moiety shall be let to such persons from the country who sent or carry the produce of their farms to market and to no others," he was not liable for selling beef because it was a product of his farm. The court held that beef was in a sense a manufactured product, the same as, while wool might be a product of the farm, still the cloth made from the wool was not a product of the farm, but the product of another trade. The court said:

"Swine, horses, neat cattle, sheep, manure, cordwood, hay, and many other things not more savory, would be out of place in a market house for the sale of poultry, vegetables, fruit, eggs, milk, butter, lard, and other provisions for the mouth; yet they are strictly produce of the farm; much more so, indeed, than beef, which, though it comes, like everything else, primitively from the soil, is as much a manufactured article as leather, cloth, or charcoal. The ox is the produce of the farm; beef is the produce of the slaughterhouse and the shambles."

It will be observed that this case construes an ordinance specifically prohibiting the sale of beef in a certain portion of a market, and, in arriving at the meaning and intent of the statute as to the privileges of farmers, takes into consideration what kind of produce of a farm might properly be placed in that portion of the market, and at the same time the court says that the ox is the product of the farm. By analogy calves and yearlings raised on the farm would be the same. State v. Patterson, 98 N. C. 657, 4 S. E. 47, which is cited in support of the proposition that the young cattle are not products of the farm, discusses the question as to what shall be considered the products of a farm, but it does not support the contention of the defendants. The case involved the liability of the defendant, who was indicted for selling spirituous liquor in quantities of one quart and less than five gallons without a license, "the same not being the products of his own farm." The defendants contended that the spirits were the products of his farm. However, the court found that:

"Spirits sold were of the tolls, the grain earned of the mill, as well as the products of the farm mentioned, and the defendant could not lawfully sell the same without a license unless such toll should be treated as part of the products of the farm, as counsel for defendants contend it should be. The

words of the statute are 'the products of his own farm.' Now 'a farm,' 'the farm,' 'his farm,' in the ordinary sense implies the land cultivated, used in some way for the purposes of production by the owner thereof, or some other person having a temporary estate therein, and land whether covered by forest or not, adjoining or near and more subservient thereto and used in aid thereof for the purposes of producing grain. such as wheat, Indian corn, rye, barley, cotton, fruits, hay, vegetables, and the like, and perhaps live stock, such as cattle, sheep, horses, swine, and the like by transmutation, directly or indirectly brought about by the cultivation of the soil. Burrill, Law Dictionary, word 'farm': The products of the farm are such things as are produced by labor or otherwise, or of spontaneous growth, and the 'products of his own farm' are so produced by him who owns and cultivates a farm. A mill situated on it is not a product of it. It is not the result of the cultivation of the soil. It is not essential to it. It is a structure inclosing machinery for the purposes of manufacture—transformation, not transmutation—and its earnings, the tolls, are not products of the owner's farm, but the products of the farms of other people, and the clause in question clearly does not therefore, embrace them. A grist mill is no more a part of the farm than a cotton mill, a cotton gin, a blacksmith shop, or other structures or machinery inclosed in it for the purposes of manufacture."

The only other case cited by the defendants on the question as to what shall be considered "products of the farm" is Ladd v. Abel, 18 Conn. 513. That case grew out of circumstances where A. demised to B. his farm for 999 years, and B. in consideration thereof covenanted to furnish A. and his wife with one-half of all the produce of the farm every year during the natural life of each, and, if the yearly rent and produce of the farm should not be sufficient for their support, B. should furnish them with food and clothing, and it was held that the expression "yearly produce" did not include timber. The conditions present in the case at bar were far different from that case.

In construing this contract there can be no doubt that milk, butter, hay, wool, lambs, calf skins, and swine were products of the farm, and so treated by the parties to the contract. To hold that the calf and yearlings in question were not equally the products would be a forced and unnatural construction and would depart from the intention evident from a consideration of the provisions of the entire contract, that is, not only the clauses quoted but the other provisions therein.

Having reached the conclusion that the young animals in question were a part of the products of the farm, the question arises whether the plaintiff retained the title to the same. Taking the whole contract together, reading all its provisions, it seems to have been the intention of the parties that the title to the products should remain in the owner of the farm until all indebtedness arising on account of the contract in the manner therein specified should be fully paid. While this contract in question may be considered drastic and giving to the tenant small liberty indeed, nevertheless, having been entered into, its provisions bind the parties thereto and those claiming under them. However, it must be remembered that the plaintiff's farm was the foundation of all the profits and products, and besides the plaintiff furnished, not only the farm, but nearly all the dairy and all the sheep, and in addition made advances and loans to the tenant on the farm, and therefore it was not unreasonable that the agreement should provide that the products should be his until he was paid the amount due him under the contract.

The contention of the plaintiff that he retained the title to the property in question is supported by the following authorities: In Andrew v. Newcomb, 32 N. Y. 417, it was held that:

"The owner of land may lawfully contract for its cultivation, and may provide * * * in whom the ownership of the product shall vest."

In that case it was held that the product was at all times the property of the owner of the farm under the contract of letting. See, also, Booher v. Stewart, 75 Hun, 215, 27 N. Y. Supp. 114, where it was held that under an agreement by which the tenant took the farm to work on shares, agreeing that the title to the crops should remain in the owner of the farm until advances are fully paid, the legal title to the crops was in the owner of the farm, and a chattel mortgagee of the tenant acquired no rights, since the tenant had no property or interest which was capable of transfer by chattel mortgage.

In Schroeppel v. Dingman, 17 Wkly. Dig. 257, where a contract somewhat similar to the one under consideration was in question, the court said:

"The title to the stock and farm products was vested in Schroeppel exclusively, and continued in him so long as anything remained to be done by McMullin [the tenant] under the agreement, and at the time of the levy [under an execution against the tenant] McMullin had no leviable interest in the property."

The same doctrine was laid down in McCombs v. Becker, 3 Hun, 343, and in the recent case of Wesley v. Beakes Dairy Co., 72 Misc. Rep. 260, 131 N. Y. Supp. 212.

The judgment appealed from is affirmed, with costs.

Judgment affirmed, with costs.