In re PLACE.

(District Court, N. D. New York. July 23, 1915.)

1. LANDLORD AND TENANT ⬤139—RESERVATION BY LANDLORD OF TITLE TO GROWING CROPS.

An owner of a farm and live stock thereon may, in leasing the same, retain title to the hay and crops either absolutely for the preservation of the stock, or as payment of rent, or as security for the payment of rent, but in the absence of a provision in the lease that the crops shall be the property of the landlord, the crops, as between the landlord and tenant, are, when severed, the personal property of the tenant.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 488, 492–506; Dec. Dig. ⬤139.]

2. LANDLORD AND TENANT ⬤139—RESERVATION BY LANDLORD OF TITLE TO GROWING CROPS.

A lease of a farm and cows and other live stock for a term of years, stipulating for cash rent, payable in monthly installments, and declaring that the cows are to be kept on the farm as a dairy and not to be removed therefrom, and that if the milk is sold, the checks are to come to the landlord, who may take out his rent and pay the balance to the tenant, and the milk, if made into other substance, shall be sold and the proceeds paid to the landlord, who shall retain his rent and pay the balance to the tenant, that the title to the milk or other produce of the dairy shall remain in the landlord, and that hay and fodder raised on the farm shall be fed out on the farm to the stock, and the title to the hay and fodder shall, at all times, remain in the landlord, and which binds the tenant to insure the personal property including crops and the buildings for the benefit of the landlord, and in his name, and that the tenant shall keep the dairy and stock up to its present standard, reserves in the landlord title to the hay and fodder, not as security for rent, except indirectly based on payment of rent from the produce of the dairy, but to insure the preservation of the live stock and to prevent the hay and fodder from being sold by the tenant and removed from the premises or levied on and sold by his creditors.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 488, 492–506; Dec. Dig. ⬤139.]

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BANKRUPTCY ⟨⟩444—PROCEEDINGS TO COMPEL PAYMENT TO TRUSTEE IN BANKRUPTCY—PETITION OF REVIEW.

Where a decision of the referee was made, authorizing an order directing a third person to pay to a trustee in bankruptcy certain money, but the order authorized was not entered until the entry of an order denying the application of the third person to open the case for additional testimony, the time to file a petition of review commenced to run from the entry of the orders.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 920–927; Dec. Dig. ⟨⟩444.]

4. BANKRUPTCY ⟨⟩151—TRUSTEE IN BANKRUPTCY—TITLE.

A trustee in bankruptcy has no better title or right in property than the bankrupt himself, except that the trustee may set aside transfers made by the bankrupt in fraud of creditors and recover preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193, 239; Dec. Dig. ⟨⟩151.]

5. BANKRUPTCY ⟨⟩140—TRUSTEE IN BANKRUPTCY—TITLE.

A landlord of a farm and stock for 12 years from March 1, 1911, for a cash rent, reserved title to hay and fodder to insure the preservation of the stock. The tenant went into bankruptcy in October, 1912, and he surrendered possession of the farm and the stock and hay and fodder thereon to the landlord. The landlord sold the stock and hay and fodder and received the proceeds. The cash rent up to the time of bankruptcy was paid, but the rent for the balance of the term or for the balance of the year was not paid, and the trustee in bankruptcy did not assume the lease, or sell the same, or claim the right so to do. *Held*, that the landlord had not, as against the trustee, surrendered his title to the hay and fodder, and the trustee could not compel him to pay over the proceeds thereof.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⟨⟩140.]

In Bankruptcy. In the matter of C. Dumond Place, bankrupt. On petition of review filed April 5, 1915, of two orders made by the referee in bankruptcy and each of which was made and filed March 25, 1915, and one of which adjudges the rights of the parties in certain property claimed by the trustee in bankruptcy, and directs the payment of certain sums of money by George H. Austin to said trustee, and the other of which denies an application by the said Austin, made after the decision of the referee but before the entry of any order thereon, that the proceeding be opened and he be allowed to introduce further evidence as to damages, etc. Reversed and set aside in part, and affirmed in part.

L. F. Raymond, of Franklin, N. Y., for petitioner.
Sewall & France, of Sidney, N. Y., for trustee.

RAY, District Judge. The main and important questions grow out of a farm lease and its provisions entered into January 17, 1911, between George H. Austin of Walton, Delaware Co., N. Y., the owner of a certain farm of about 233 acres of land and 34 cows, 2 heifers, and 1 bull, all Holsteins, and certain farm implements thereon, and whereby the said owner and lessor, George H. Austin, demised and leased to said C. Dumond Place, later bankrupt, and Stephen D. Place the said farm, stock, and implements for the term of 12 years

from March 1, 1911, and which lease by express provision was to terminate March 1, 1923. As to the said cows the lease provides:

"Said cows are leased to be kept and used on said farm as a dairy and not to be removed therefrom except as herein provided."

The lease then provides that as rent for said real and personal property and for the use of same under the agreement, in addition to the other things which the lessee agrees to perform, and in addition to the taxes and insurance which he agrees to pay, the lessee will pay for the first year $750, viz., $150 down and the remainder in monthly payments as provided for the other years; the rent for the other years to be $600 per annum and paid in monthly payments, viz., April 25th, $40; May 25th, $50; June 25th, $65; July 25th, $80; August 25th, $80; September 25th, $80; October 25th, $80; November 25th, $70; December 25th, $55. If the milk is sold the checks are to come to the landlord and he take out his rent and pay the balance, if any, to the lessee. If made into other substance, then same to be sold, the proceeds to be paid to the landlord, who retains his rent and pays the balance, if any, to the tenant. Then follows this provision:

"It is agreed that title to the milk or other products of the dairy shall at all times be and remain in the parties of the first part [landlord], subject however to the provisions of this agreement."

That is, any surplus after paying the rent to go to the lessee. Then follows this provision:

"It is also provided that the hay and fodder raised on the place shall be fed out on the farm to the leased property, and the title to the same (the hay and fodder) shall at all times be and remain in the parties of the first part [landlord], subject to the provisions of this lease."

The second parties were to pay the taxes. Then came the following:

"It is further agreed that the parties of the second part will keep the said personal property and the buildings on the real property insured in the name of the first party in a sum approved by him and not less than three thousand dollars on the buildings and fifteen hundred dollars on the stock and five hundred dollars on the hay and farm products and shall pay the insurance premiums thereon, but it is agreed that in case of loss by fire to either the buildings or the personal property the insurance money when received by first party shall be used to replace or repair the buildings lost or injured and to replace the personal property lost or injured, so far as the insurance money will repair, or replace the said buildings or personal property, but the first party shall be under no obligation to use or furnish any more than the insurance money received by him, for said purpose.

"It is further provided that the parties of the second part shall at all times keep the dairy and stock good and up to its present standard as far as possible, they to stand all loss and depreciation in or to the same, and to that end whenever any of the cows become unfit or undesirable for dairy use the second parties may with the consent and approval of first party exchange the same for other animals suitable for dairy use, and in such case the new cows put into the dairy shall become the property of first party and the cows taken out shall become the property of second parties. It is understood and agreed that the title to the personal property leased hereby shall at all times be and remain the property of the party of the first part and also such animals as shall be put in place of any lost or injured.

"It is further agreed that second parties shall at all times keep the number

of the dairy good by replacing any which may die with others which are good dairy cows and as nearly up to the standard of those lost as practical."

Then came provisions that the lessee should properly till the farm, care for and feed the stock, etc. If rent was not paid as agreed, then the lessor could re-enter, etc. The lease then contained an option to purchase, not only the land, but personal property so leased. The lessor was careful to expressly retain title to the live stock, cows, etc., which he owned and leased to Place and to any purchased or raised to take the place of any sold, and no change or sale could be made without the express consent of the lessor as owner. He was also careful and particular to retain and reserve the absolute title to all the hay and fodder produced on the place, and provide that it be fed to the live stock on the place and insured in his name. As the rent was coming from the proceeds of the milk or dairy, into whatever form it was converted by manufacture, and as the landlord owned the live stock and farm, it was essential that the stock be fed. Title to the milk evidently was retained to insure payment of the rent. As the tenant was to have the surplus of the proceeds of the dairy products, milk, butter, or cheese, there was a sort of joint ownership in such proceeds, but as to the hay and fodder there was no such clause or condition. Remotely and in a roundabout way title to the hay would insure the payment of rent, for if the cows were not fed in winter, they would not live or give milk either winter or summer, but the retention and reservation of the title to the hay and fodder raised and growing, or raised and cut, on the farm was not in any legal sense security for the payment of the rent, which was secured to be paid from the proceeds of the dairy, and was not to be applied to the payment of rent. The retention and reservation of the title to such hay was security for the preservation of the lives of the owner's cattle. The landlord, the owner of the farm and live stock, had the right to reserve the hay and retain the title thereto, which he did in unequivocal language.

Under the terms and provisions and conditions of the lease the tenant had no ownership or title whatever in the hay. He did have the right, under the agreement to have it retained on the farm, to feed the live stock so long as he remained thereon under the lease. The title was in the lessor whether the rent was paid or not. The lessee had no right at any time to remove it from the premises or to sell any part of it. If title had not been reserved, it was a natural product of the land, title to which would have been in the lessee. It was logical that the lessor should reserve the title to the hay and fodder (emblements). There is no provision in the lease for purchasing hay or fodder, and can it be supposed, in face of the provisions of this lease, that this tenant at the end of August or September, on paying the rent for the month, or at the end of the first year, on paying the December rent (all prior rent having been paid), could have lawfully sold off the hay and put the proceeds in his pocket as his own and left the owner of the farm, the farm, and the live stock thereon, without hay for feeding the balance of the winter and leaving the owner to purchase hay and feed in the market and sue to recover damages

for a breach of contract? The very explicit terms of the lease and the circumstances of the case, including ownership by the landlord of both farm and cattle, forbid such a conclusion or such a construction of the terms of this lease. Such a contingency was guarded against by the reservation of title. Some considerable time prior to the bankruptcy of C. Dumond Place the said Stephen D. Place sold out or transferred his rights and interests under this lease to C. Dumond Place and left the farm. C. Dumond Place remained on the farm until about October 1, 1912, when he went into bankruptcy and gave up and surrendered possession of the farm to the landlord, including possession of the stock and hay and fodder. Mr. Austin, not living on the farm but at a distance, in the fall of the year, with winter coming on and without tenant or help, sold off the cattle and hay and fodder and received the proceeds. There was no transfer or sale by Mr. Austin of any of the cattle or hay or fodder to Place at any time. The trustee in bankruptcy claimed the hay and fodder on the place, and Mr. Austin became a party to the bankruptcy proceedings for the purpose of testing or trying out the title to this hay and fodder, with other questions not of consequence here, and the referee found and held by order made and filed March 25, 1915, as follows:

"Further ordered that, it being conceded that the said George H. Austin had and used the emblements upon said farm as inventoried herein, to wit: 32½ tons of hay of the value of $10 per ton and 4⅘ tons of green fodder, millet and oats at $10 per ton, amounting in all to $373, the said George H. Austin is hereby directed to pay said sum of $373, the value thereof to said Chester B. Teed, the trustee herein."

It appears from the memorandum of decision made by the referee that he based this finding and holding on the fact that as the hay and green fodder, millet, and oats were emblements, raised and produced on the farm, they belonged to the tenant and so passed to the trustee in bankruptcy, and that Austin is liable to pay to such trustee the value of same, notwithstanding the terms of the lease and reservations of title therein expressed. The cash rent, up to the time of the bankruptcy, was paid, but the rent for the balance of the term, or even the balance of the year, was not paid, and has not been paid, and the trustee in bankruptcy did not assume the lease or sell same, or claim the right so to do, or offer to perform it.

[1] With the holdings and decisions of the learned referee this court is unable to agree, and the decided cases are against them. The owner of a farm and of the cows and other live stock thereon in leasing same is not bound to part with the title to the grass when made into hay or with the crops grown thereon. He would part with title thereto, and they would belong to the tenant under an out and out lease for a money rent in case he did not clearly reserve and retain title, either absolutely for the preservation of the stock, or as payment of rent, or as security for the payment of rent. Either of these things he may do. There is no statute or public policy which forbids it. It is always a question whether or not he has lawfully done so. When, as here, the language is clear and unequivocal, there is no chance for construction by the courts, and when, as here, the language is made

clear and express that the hay and fodder is to be insured in the name of the landlord, we have an interpretation of the meaning and intent of the parties as to ownership expressed by themselves in writing, if any is needed.

"As between the landlord and the tenant, the annual crop raised on the leased property constitutes no part of the freehold, and, when matured or severed from the soil during the term of the tenant's lease, it becomes his personal property which he may dispose of as he sees fit, in the absence of a provision in the contract for the rental that the crop shall be the property of the landlord until rent is paid or secured." 24 Cyc. 1067; Andrew v. Newcomb, 32 N. Y. 417; McCombs v. Becker, 3 Hun (N. Y.) 342; 5 Thompson & C. 550; Crotty v. Collins, 13 Ill. 567; Fox v. McKinney, 9 Or. 493; Young v. Watters, 5 Pa. Co. Ct. R. 127; Hunt v. Scott, 3 Pa. Co. Ct. R. 411.

"The ownership of realty carries with it, as an incident thereto, the prima facie presumption of the ownership of both the natural products of the land, such as grass and trees, and the emblements, or annually sown crops. The owner of land, however, may, in parting with the use of it to another, make such conditions and reservations in relation to the land itself, or the products growing from it, as he chooses, instead of parting with the full right." 12 Cyc. 976; Andrew v. Newcomb, 32 N. Y. 417; Howell v. Foster, 65 Cal. 169, 3 Pac. 647; Moulton v. Robinson, 27 N. H. 550; Angell v. Egger, 6 N. D. 391, 71 N. W. 547; Fox v. McKinney, 9 Or. 493; Cons. Land, etc., v. Hawley, 7 S. D. 229, 63 N. W. 904; Bellows v. Wells, 36 Vt. 599; Esdon v. Colburn, 28 Vt. 631, 67 Am. Dec. 730; Smith v. Atkins, 18 Vt. 461; Ponder v. Rhea, 32 Ark. 435; Wesley v. Beakes Dairy Co., 72 Misc. Rep. 260, 266, 131 N. Y. Supp. 212; McCombs v. Becker, 3 Hun (N. Y.) 343.

In Andrew v. Newcomb, supra, it was expressly held:

'The owner of land may lawfully contract for its cultivation, and may provide, by such contract, in whom the ownership of the product shall vest. In such contract the parties may provide that upon the performance of a condition, or the happening of an event, the ownership shall be changed. Such an arrangement is not a conditional sale, as the subject-matter was not in existence at the time of the contract. Under such contract, the property vests in the proper party as soon as it comes into existence. Crops to be raised are an exception to the general rule 'that title to property not in existence cannot be affected so as to vest the title when it comes into existence.' In case of crops to be sown, it vests potentially from the time of the bargain, actually, as soon as the subject arises."

In Wesley v. Beakes Dairy Co., 72 Misc. Rep. 260, 131 N. Y. Supp. 212, the lease provided that the lessor should furnish 10 cows with the premises. The annual rent was $425. The rent was to be paid as follows:

"First party is hereby authorized to collect all cheese checks from the factory whenever due from the 1st day of July, 1910, until he shall have collected the amount of $425. If however the said cheese checks are not sufficient to pay all of said rent, then said first party is hereby empowered to collect the canning factory checks for any remainder of unpaid rent."

If rent was not paid, the landlord could sue or re-enter. Judge Hazard said:

"We start out with the fact that the farm in question belonged to Dodge, the incompetent person, and that 7 of the 10 cows (as shown by the evidence) were Dodge's. It seems to me that the provision quoted amounts to a reservation of title in the landlord to the proceeds of the dairy. It is doubtless true that, in the ordinary relation of landlord and tenant, the products of the farm belong to the tenant; but it is also true as a legal proposition that the landlord may reserve title to those products, either as security for the payment of the rent, or as the rent itself."

That learned judge cited and quoted from Andrew v. Newcomb, supra, and McCombs v. Becker, 3 Hun (N. Y.) 343. In McCombs v. Becker, supra, the court said:

"It was entirely competent for the defendant and his tenant to agree that the hay to be raised upon the demised premises should be and remain the property of the defendant until the rent should be paid, and the conditions of the lease satisfied by the tenant. Instead of the tenant mortgaging the crop to be grown, as security for the rent, he may agree that the crop shall be the landlord's until the rent be paid. In the one case the agreement is that the crop shall be the landlord's if the tenant does not pay the rent; in the other that it shall not be the tenant's until he does pay it."

[2] In the case now before this court it is evident that the purpose of the retention or reservation of title to the hay and fodder was not as security for rent, except in a very indirect manner, which was, as stated, to be paid from the products of the dairy, but to insure the presence of cows and the preservation of the lives of the cows and other cattle, the property of the landlord, and insure their being able to produce milk, and to prevent the hay from being sold by the tenant and removed from the premises, or levied on and sold by his creditors. The hay and fodder were not to belong to the tenant at any time, and as the lease was to expire in the latter part of the winter, 1923, it would be necessary that in the meantime the hay and fodder be on the place for feeding, and the remainder, if there was a remainder, on hand to "carry the cattle out to grass," as the expression goes. The work and labor put into the production of the hay and fodder on the farm was a part of the consideration for the use of the farm, cows, bull, and farming tools leased. See Booher v. Stewart, 75 Hun, 214, 27 N. Y. Supp. 114, for confirmation of this principle. Coville v. Miles, 127 N. Y. 159, 27 N. E. 809, 12 L. R. A. 848, 24 Am. St. Rep. 433—and there are many similar cases—is a case where there was no reservation of title to hay or fodder, or provision that the title to such products should be and remain at all times in the lessor and owner of the leased premises and stock. Such a reservation of title was sought to be spelled out of the facts that the tenant agreed to take charge of the live stock, in which both landlord and tenant had a joint interest, to raise enough hay and fodder to feed it, and if there was a deficiency purchase so much as was required. This the Court of Appeals in New York held did not establish a reservation of title. In Heald v. Builders' Mut. Fire Ins. Co., 111 Mass. 38–40, the opinion states the facts, and the court held:

"The plaintiff had no insurable interest in the hay and straw named in the policy of insurance. He claims title by bill of sale from Benjamin B. Roberts and Daniel R. Heald, who harvested the same under a lease from the Hubbards. The lease was in writing, and contained a clause in these words: 'The lessees agree that they will carefully tend and fodder the stock kept on said premises, with the hay and other fodder which shall grow or be raised on said premises; and that they will not sell, dispose of, or carry away, or suffer to be carried away from said farm any of the hay or fodder of any kind, or any of the manure which shall be made on said premises, except by written agreement of the lessors.' The principal part of the stock on the farm was the property of the lessors. The plaintiff knew of this provision in the lease, and the bill of sale to him was made without the written agreement of the lessors. Whatever remote interest the tenants had in the

produce of the farm, they had no property in it which they could dispose of by sale. The lessors had the right to reserve the crops, or any interest in them, in advance. It was in the nature of a reservation of rent. Taylor, Land. & Ten. § 152. It is not simply an agreement or covenant that none of the productions named should be carried away, for breach of which they would be liable in damages; but it was an agreement that it should not be sold. It was a limitation on the title, which was to remain in the landlord subject to the tenants' right to use it in the cultivation of the farm. It is an evasion to say that the interest which the tenants had in the possession and use of the property, and in the profits which might accrue from its use upon the farm, passed by the bill of sale to the plaintiffs and was an insurable interest. This would defeat the plain words of the agreement, one purpose of which, no doubt, was to avoid conflicting claims of other parties, which might arise under a sale. Lewis v. Lyman, 22 Pick. 437; Briggs v. Oaks, 26 Vt. 138."

It will be noted that in the case just referred to the principal part of the live stock belonged to the lessors. In the case at bar the title to the hay and fodder raised on the leased farm was reserved—it was expressly provided and agreed that such title should be and remain in the lessor at all times. There is no suggestion in the lease it was to remain there as security for the payment of rent, and if the lease did so provide, or if such were the correct construction of the contract, the retention of title was not as security for the payment of rent for one month or one year, the year the crop was produced, but for many years, and there is no pretense the balance of the rent for 1912 was paid or released, or that the rent for the remaining years was paid or released. The referee found that this was not a chattel mortgage requiring filing, and in that this court fully concurs. Hence, the lessor having taken possession of the hay and fodder, the burden was on the trustee, before he could recover anything, to show that, aside from damages sustained by the lessor, he was entitled to recover. But it is useless to discuss that proposition, as the title was not retained as security for the payment of the rent. To so hold would be importing into the lease provisions not found there, and the terms of which would be conjectural. In short the court would be attempting to make an agreement of lease different from the one drawn and signed, and under which the parties operated for about 1 year and 6 months.

[3] Mr. Austin did not waive or abandon any of his rights by moving before the referee to open the hearing and produce further evidence. No order had been signed or entered; no judgment pronounced. No order was entered until March 25, 1915, when the order denying the application to open the case and produce additional testimony was also entered, and the time to file a petition of review then commenced to run. Such petition was filed in time.

[4, 5] It is unnecessary to recite the now familiar doctrine of the bankrupcy law that the trustee in bankruptcy has no more extensive and no better title or right in property than did the bankrupt himself, except he may set aside transfers of property made by the bankrupt in fraud of his creditors and recover preferences. The proposition is hardly susceptible of argument that Place, at the time the petition in bankruptcy was filed, or at any time before, on paying the rent due and payable up to that time, could have taken and removed from the farm or sold the hay or fodder in question. His bankruptcy con-

ferred on him no greater right to the hay and fodder than he would have had remaining solvent. The landlord, Mr. Austin, did nothing to surrender, release, or impair his own title, and there is no evidence whatever that he did. He asserted his title and disposed of his own— that which under the lease he was entitled to.

The order under review made by the referee and filed in his office March 25, 1915, in so far as it adjudges that "the reservations contained therein (of title to hay and fodder) were security for the performance of the agreement on the part of the bankrupt" as applied to the payment of rent, and that the hay and fodder, "emblements of the farm, belonged to the bankrupt when the rent was paid in full, and passed to the trustee herein," and, in so far as it adjudges and directs that George H. Austin pay to Chester B. Teed, the trustee in bankruptcy of C. Dumond Place, the sum of $373, the value of 32½ tons of hay and 4⅘ tons of green fodder, millet, and oats, is reversed and set aside. Otherwise same is affirmed. There will be an order accordingly.